319 So.2d 53 (1975)
In The Interest of IVEY, Infant (WF) Dob: 8-31-75, and Ivey, Infant (WF) Dob: 8-31-75.
No. Z-362.
District Court of Appeal of Florida, First District.
September 18, 1975.
*54 Joel M. Cohen, Pensacola, Guardian Ad Litem for the above named infants, appellants.
Henry Clay Mitchell, Jr., Pensacola, for the parents of the above named infants, appellees.
Charles S. Williams, Asst. State Atty., for the State of Florida.
Louis F. Ray, Jr., Pensacola, for Edward R. Westmark, M.D., amicus curiae.
Lawrence W. Oberhausen and Patrick Emmanuel, of Holsberry, Emmanuel, Sheppard, Mitchell, & Condon, Pensacola, for Sacred Heart Hospital, amicus curiae.
PER CURIAM.
This is an interlocutory appeal from an order of September 5, 1975, of the Circuit Court of Escambia County, Juvenile Division, brought by Joel M. Cohen, as guardian ad litem for the above infants, to review an order of the court below which ruled that the court did not have authority to order that blood transfusions be given to the two infants by a willing physician. Due to the extreme emergency involving the life or death of the two infants, we held an emergency hearing on the afternoon and evening of September 5, 1975. The attorney for the natural parents of the infants filed an affidavit stating that he, on behalf of the natural parents "has no objection to the immediate appeal, hearing and disposition of this cause by Appellant Joel M. Cohen, as Guardian Ad Litem of said children, and I hereby expressly waive all compliance by the Appellant with the Florida Rules of Appellate Procedure and consent to the conduct of an emergency hearing on the afternoon of September 5, 1975." Also, the attorney for the State of Florida filed an affidavit to the same effect.
We heard arguments by the guardian ad litem, by the attorney for the Sacred Heart Hospital appearing as amicus curiae and by the attorney for Dr. Edward Westmark, M.D., the infants' treating physician, as amicus curiae. Both amici curiae were represented by counsel in the proceedings below and Dr. Westmark testified as a witness. The attorneys for the parents of the infants and for the State of Florida did not attend the hearing (oral arguments) before us. Subsequently, on September 5, 1975, we entered an emergency order reversing the ruling of the trial court and ruling that under the circumstances shown by the record the court below had full authority to order Dr. Edward Westmark, M.D., (it appearing from the evidence that he was willing to act in compliance with the court's order) or any other physician under his direction and control, to administer such blood transfusions to the two infants as he may, in his medical judgment, deem necessary. We further stated that a full opinion would be subsequently issued. This is that opinion.
Following an evidentiary hearing on September 3, 1975, the court below entered an order in which it found that the children were born on August 31, 1975, in Bay County, Panama City, Florida; that they were born prematurely and for that reason required immediate medical care and were *55 placed in the Sacred Heart Hospital in Escambia County, Pensacola, Florida, by their father, where they have remained since that time; that because of the physical condition of the children, the attending physicians recommended blood transfusions to increase their probability of survival; and that their hour-to-hour condition is subject to fluctuation. The trial court determined this to be a life or death situation with a very slim prospect of survival of the children and further found that because of their religious beliefs, the parents of the children had denied authority to the attending physician to administer blood transfusions recommended by the physicians as approved medical procedures in such instances. The court ordered that the children be placed in the temporary care, custody and control of the guardian ad litem and that he "in his judgment and upon the recommendation of the attending physicians, shall be and he is hereby authorized to sign and otherwise execute any and all medical consents required by the attending physicians or any physician qualified by any hospital board to perform blood transfusions on infants." The court further ordered that the attending physician or any licensed physician qualified by any hospital board to perform blood transfusion procedures on infants, willing to do so, was authorized to perform blood transfusion procedures as medically required with the consent of the guardian ad litem of the children. Thereafter, the guardian ad litem filed a motion to amend the foregoing order, contending that under Chapter 75-185(1), Laws of Florida, the court is authorized to order that medical services be rendered. The guardian ad litem requested that the court order the attending physician or any licensed physician to perform the transfusions. The court then entered its order from which this appeal is taken by which it construed Chapter 75-185(1), supra, as not authorizing the court to enter such an order and ruled that the court was not otherwise empowered to enter such an order.
It affirmatively appears from the record and from the oral arguments before this court that the infants' treating physician declined to administer the blood transfusions, which, in his opinion, were medically necessary, without an order of the court that he do so because of fear of a malpractice suit if he proceeded only on the basis of an authorization of the guardian ad litem. Thus, the question presented to this court on this appeal is whether or not the trial court was correct in its ruling that it did not have authority to order the transfusions. We find that the findings of the trial court were correct except for its finding and ruling that it did not have jurisdiction under Chapter 75-185(1), supra, or otherwise to order the transfusions.
Dr. Westmark was fully qualified as an expert witness  a medical doctor specializing in pediatrics and subspecializing in neonatology or the care of the sick newborn. He testified that the infants (twins) were born prematurely and at birth the smallest weighed 703 grams and the larger weighed 951 grams. Translating this into pounds, he testified that each would weigh under two pounds; that both initially had respiratory stress and required oxygen therapy. Without going into the details of Dr. Westmark's testimony regarding their condition, it is clear from such testimony that they both were in critical condition at the time of the hearing before the trial judge and prior thereto. It had been medically necessary that blood be drawn from the infants for certain tests which are routine in premature births. Such blood withdrawals were made with the consent of the parents. The parents had no objection to the withdrawals, but because of their religious beliefs, they objected to transfusions or replacement of blood. The doctor testified as follows as to the need for blood transfusions:
"As you draw blood to monitor the various parameters in the blood, it depletes the blood supply and although infants are able to manufacture some blood, at *56 this size and age, they are not able to manufacture enough to replenish that which we draw and it is customary practice in all infants of this size that when we have reached a certain amount of blood withdrawn, we need to replace that blood."
The doctor further testified:
"A We are able from graphs on studies from large numbers of infants of lowbirth weight to come up with a predicted mortality figure, and what we do is take these infants' weight and gestational age and plot them on this graph and it shows us and tells us what their predicted mortality is. Now, if, in the course of caring for these infants you continue to withdraw blood and you are unable to replenish it, then there is going to be a point when you have withdrawn enough blood that the lack of blood is going to be injurious to the infant.
Q So injurious as to cause death?
A It certainly could reach that proportion.
Q And prior to any injury causing death, it would cause brain damage or damage of other vital organs?
A Well, yes, it would cause damage to other vital organs, probably sooner than it would cause brain damage by depleting the red blood cells which carry oxygen to all of the organs, then the infant would get in trouble with the oxygen supply to the heart, lungs, etcetera."
The doctor testified that "for the smaller of the twins, the predicted mortality or the percentage likelihood of death would be ninety-two per-cent and for the larger of the two, it would be eighty-two per-cent" if blood transfusions were not administered. He testified that from a medical point of view the infants are in need of transfusions; that transfusions would, in his opinion, increase their chances of survival. Upon inquiry from the court as to how much time it had before a decision must be made, Dr. Westmark testified:
"This is dependent upon several factors and I am sorry that I can't give you an exact time. For example, if one of the infants develop a hemorrhage, which is common in these low birth-weight babies, the necessity for transfusion would be immediate. If we continue to draw blood for laboratory studies and try to reduce those to the least we can get by with, it may take several days, if nothing intervened that made the babies acutely worse."
The court then asked, "Would you characterize this as being a life or death situation?" to which the doctor replied, "Potentially yes  it could become so at any point."
The trial court, and this court on appeal, were thus confronted with the proposition that although these infants might die even with a transfusion, the failure of the court to act to require the transfusions could result in the death of one or both of these infants. The doctor testified that in a similar case where the parents have given consent, it would be a well-established standard of medical practice to give the transfusions. Dr. Reed Bell, a medical doctor specializing in pediatric medicine testified to the same general effect as did Dr. Westmark. The father of the infants, though present at the hearing, did not testify.
Chapter 39, Florida Statutes, deals with juveniles and juvenile treatment. Section 39.08 provides in pertinent part as follows:
"After a petition has been filed, the judge may order the child named in the petition to be examined by a physician, ... willing to do so. After a child has been adjudicated to be a dependent or delinquent child ..., or before such adjudication with the consent of any parent or legal custodian of the child, the judge may order the child to *57 be treated by a physician, ... willing to do so. .. . Nothing in this section shall be deemed to eliminate the right of the parents or the child to consent to examination or treatment for the child, except that consent of a parent shall not be required if the physician determines there is a serious injury or illness requiring immediate treatment and the child consents to such treatment or an ex parte court order is obtained authorizing said treatment." (Emphasis supplied.)
Under the evidence presented in this cause, the trial court had full authority to authorize treatment (blood transfusions) for the infants. This the trial court did by authorizing the guardian ad litem to authorize the transfusions, but it ruled that it did not have authority to order such treatment.
Chapter 75-185, Laws of Florida, amends Chapter 827, Florida Statutes, 1974 Supplement, which relates to child abuse and support of dependents. Amended Section 827.07 thereof, which became effective June 30, 1975, casts further light on the trial court's authority in such a situation as that presented here. Subsection (2) thereof provides that the purpose of the section is to provide for the detection and correction of the abuse or maltreatment of children who are unable to protect themselves. It defines such abuse or maltreatment as including "any willful or negligent acts which result in neglect; ... or; failure to provide necessary treatment, attention, sustenance, clothing, shelter, or medical services;" (emphasis supplied). It then sets forth the following language which the trial court interpreted as not giving it authority to order the blood transfusions:
"... however, such an exception shall not preclude a court from ordering that medical services or treatment by a duly accredited practitioner who relies solely on spiritual means for healing in accordance with the tenets and practices of a well recognized church or religious organization be provided to the child, when his health requires it." (Emphasis supplied)
The trial court considered the above quoted provision ambiguous and because of the ambiguity it did not authorize the court to order medical services (blood transfusions) to be given a child in a life and death situation such as this. It appears that the trial court construed this provision as only authorizing him to order treatment by a duly accredited practitioner who relies solely on spiritual means for healing in accordance with the tenets and practices of a well recognized church or religious organization. Since "medical services" is obviously not treatment by a practitioner who relies solely on spiritual means for healing, such interpretation necessarily ignores the words which authorize the court to order that medical services be provided to the child. The statement is in the disjunctive through use of the word "or" and thus the stated exception does not preclude a court from ordering either that medical services be provided to the child or that treatment by a duly accredited practitioner who relies solely on spiritual means for healing be provided to the child. This is further clarified by the title of the act which states in pertinent part as follows:
"... providing that if in the legitimate practice of religious belief, specified medical treatment is not provided to a child that such action shall not be considered neglect for that reason alone; providing that the legitimate practice of religious beliefs shall not preclude a court from ordering that medical service be provided to a child where his health requires it; ..." (Emphasis supplied)
It is clear that the legislature intended to recognize that the court already had authority to order that medical service be provided to a child where his health requires.
*58 While this appears to be a case of first impression in Florida, the overwhelming weight of authority throughout the country supports the view that the state, as parens patriae, may step in and protect the rights of a child threatened with death because its natural parents will not consent to medical treatment because of religious beliefs or otherwise. The courts of equity have historically possessed the power to enter orders in this regard, and this power has been codified into statutes in many states. In State v. Perricone, 37 N.J. 463, 181 A.2d 751 (N.J. 1962), the lower court had entered an order appointing a guardian empowered to consent to the administration of blood transfusions to children over the objection of the parents made on religious grounds. (This case is remarkably similar to the case sub judice.) On appeal, the parents claimed that the court lacked jurisdiction to issue the order under the statutes. The New Jersey Supreme Court found that even absent a statutory provision, "the common law courts could act to protect the interests of the child, take custody from the parents and appoint a guardian when the parents had failed in their duty or were unfit to be entrusted with the care of the child" [citation omitted] and that "the principles regarding the State's interest in infants were specifically written into the statute ..." The court noted that a question had arisen as to why the trial court felt it necessary to appoint a special guardian rather than ordering the transfusion directly. The court explained that this was done because the child might need additional transfusions, and, if so, the guardian could order them without instituting another suit  not because the trial court lacked authority to directly order transfusions.
In People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 30 A.L.R.2d 1132 (1952), cert. den. 344 U.S. 824, 73 S.Ct. 24, 97 L.Ed. 642 (1952), the Illinois Supreme Court upheld a finding by the lower court that a child whose life was endangered by the refusal of the parents to permit blood transfusions was "neglected" within the meaning of an Illinois statute and it went on to state:
"The jurisdiction which was exercised in this case stems from the responsibility of government, in its character as parens patriae, to care for infants within its jurisdiction and to protect them from neglect, abuse and fraud [citation omitted]. Historically exercised by courts of chancery [citation omitted] it is of `ancient origin'. Cowles v. Cowles, 3 Gilman 435. That ancient equitable jurisdiction was codified in our Juvenile Court Act .. ."
As stated in 59 Am.Jur.2d "Parent and Child", § 15 page 98:
"A parent has a legally enforceable duty to provide his child with necessary medical care. It is ordinarily for the parent in the first instance to decide, however, what is actually necessary for the protection and preservation of the life and health of his child, so long as he acts as a reasonable and ordinarily prudent parent would act in a like situation."
In this connection, however, we find the following statement in § 9, page 92:
"The state, as parens patriae, has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare. The parents, as natural guardians, are responsible to the state for the child's well-being. The natural rights of a parent to the custody and control of his infant child are subject to the power of the state, and may be restricted and regulated by appropriate legislative or judicial action. This power is based on state's duty, as parens patriae, to protect those of its citizens who are unable because of infancy to take care of themselves, and on the right of the child, as citizen and ward, to its protection, as well as upon the state's interest in its own perpetuation. Where the parents, because of their religious beliefs, or for other reasons, fail to provide or *59 refuse to permit medical treatment which the child requires for its health or survival, the state may take custody from the parents in order to provide such treatment ..."
In 30 A.L.R.2d 1138, under the heading "Power of Public Authorities to Order Medical Care for a Child Over Objection of Parent or Custodian", we find the following:
"Although recognizing that parents have a strong natural interest in the custody and control of their children, and that this interest includes the supervision of the children's physical well being, the courts have agreed that the state has an overriding interest as parens patriae, and in a proper case may interfere to insure that the child is given medical treatment necessary for the protection of its life or limb where the parents have unreasonably refused to supply or allow such treatment, because of religious scruples or otherwise."
Section 39.08, Florida Statutes, authorizes the court after a child has been adjudicated to be a dependent child, to order the child to be treated by a physician willing to do so when the parents do not consent to such treatment. It specifically provides that the consent of a parent shall not be required if the physician determines there is a serious illness requiring immediate treatment and authorizes the entry of an ex parte court order authorizing such treatment. We find no material difference between the court entering an order authorizing treatment and, in a life and death case such as that sub judice, ordering the physician, who is willing to act in compliance with the court's order, to administer such blood transfusions (treatments) as he may in his medical judgment deem necessary, the physician having stated that this involves a question of life and death of the infants and that he is willing to act in compliance with a court order, but that (for his own protection) he is unwilling to act on mere authorization of the guardian ad litem. The left-handed statement contained in Section 827.07, as amended, supra, is unnecessary to this ruling though we consider that it reinforces the court's authority in the premises.
The trial court expressed some doubt as to whether or not it had authority to enter an order directing action by a physician who was not a party to the proceeding. Here, however, the physician was a witness in the proceeding and was represented by counsel. Further, he appeared as amicus curiae in this court and was represented by counsel. He has testified that he is willing to administer the blood transfusions recommended by him and will comply with the court's order if he is directed to do so. We find no lack of authority in the trial judge under these circumstances. The physician has voluntarily submitted himself to the jurisdiction of the court.
Reversed and remanded.
McCORD, Acting C.J., and MILLS and SMITH, JJ., concur.