**No. 28462**

**People of the State of Colorado,
In the Interest of D.L.E., a Child and Concerning J.E.**

(614 P.2d 873)

Decided July 14, 1980.                    Rehearing denied August 5, 1980.

Reams and Kaye, Bruce J. Kaye, for petitioner-appellee.

Jerry W. Uhrlaub, William M. Kane, for appellant.

*En Banc.*

JUSTICE ERICKSON delivered the opinion of the Court.

Acting in its capacity as a juvenile court, the district court adjudicated D.L.E., who was twelve years old, a "dependent child" under section 19-1-103(20)(d)-(e), C.R.S. 1973 (now in 1978 Repl. Vol. 8). The court held a dispositional hearing the same day, and awarded the Mesa County Department of Social Services legal custody of D.L.E. with directions to arrange for medical treatment. D.L.E. appeals and we reverse.

As a result of brain damage occurring at the time of his birth, D.L.E. has experienced a series of grand mal epileptic seizures. On religious grounds tied to her membership in the General Assembly and Church of the Living Born, D.L.E.'s adoptive mother, J.E., has refused to comply with a program for medical treatment for D.L.E. A religious tenet of that sect is that if a member of that faith becomes ill, he should seek out church elders, who will pray over the sick person, anoint him with oil, and ask that God intercede.[1] A church member who seeks aid from a doctor demonstrates a lack of faith in the teachings of the church. Neither D.L.E. nor his mother believes that medical treatment is warranted in this case. They assert their right to religious freedom as a defense to the state's dependency petition, which alleged a failure to provide proper medical care. *U.S. Const.* amend. I; *Colo. Const.* art. II, sec. 4.

The juvenile court adjudicated D.L.E. a dependent child under section 19-1-103(20), C.R.S. 1973, which provides:

"'Neglected or dependent child' or 'dependent or neglected child' means a child:

. . . .

"(d)   Whose parent, guardian, or legal custodian fails or refuses to provide proper or necessary subsistence, education, medical care, or any other care necessary for his health, guidance, or well-being;

---

[1] Church members base their belief on the Fifth Chapter, Fourteenth Verse of James: "Any sick among you let him call for the elders of the church, and let them pray over him annointing with oil in the name of the Lord and the prayer of faith shall save the sick, and the Lord shall raise him up and if they have committed sin, it shall be forgiven them."

"(e) Who is homeless, without proper care, or not domiciled with his parent, guardian, or legal custodian through no fault of such parent, guardian, or legal custodian."

At the dependency hearing and on appeal D.L.E. and J.E. assert that their right to refuse medical treatment on religious grounds[2] is recognized by section 19-1-114, C.R.S. 1973 (now in 1978 Repl. Vol. 8), which provides: "Notwithstanding any other provision of this title, no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone, be considered to have been *neglected* within the purview of this title." (Emphasis added.)

The juvenile court held that, while section 19-1-114 barred a finding of neglect under section 19-1-103(20), it did not bar a finding of dependency. We disagree.

Although the trial court correctly noted that section 19-1-114 states only that a child shall not be found neglected if he is treated in accordance with his parents' religious beliefs, we do not agree that the legislature intended to allow a finding of dependency under the same circumstances. The terms neglected or dependent are used interchangeably in section 19-1-103(20) and by setting these out in the alternative the legislature intended that "'neglected or dependent child' or 'dependent or neglected child'" would stand for a single concept.[3] In this regard, we find it persuasive that in no other section of this title are the terms given independent meaning. Under the facts of this case and based upon the expert testimony in the record, the trial court was precluded by section 19-1-114 from finding D.L.E. dependent pursuant to section 19-1-103(20).

In reaching our decision, we emphasize by way of limitation that this is not a case where D.L.E.'s life is in imminent danger through a lack of medical care. *Compare, People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 104 N.E.2d 769 (1952); *Mitchell v. Davis*, 205 S.W.2d 812 (Tex. Civ. App. 1947). *See also, In re Green*, 448 Pa. 338, 292 A.2d 387 (1972). Although the trial court found that D.L.E.'s life would be in danger if he did not receive treatment, there is no support in the record for

---

[2] We recognize that the United States has placed a heavy burden upon the state and the courts to justify any infringement of an individual's First Amendment freedoms. *E.g. Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). As Judge Dreier aptly put it in *Muhlenberg Hospital v. Patterson*, 128 N.J. Super. 498, 320 A.2d 518 (1974):

"The Courts have been and will continue to be the guardian of the religious rights of the individuals to see that this power of the State is not exercised beyond the area where treatment is necessary for the sustaining of life or the prevention of grievous bodily injury."

[3] None of our our previous decisions have recognized a distinction between a finding of dependency and neglect. *People in the Interest of D.A.K.*, 198 Colo. 11, 596 P.2d 747 (1979); *Denver v. Juvenile Court*, 182 Colo. 157, 511 P.2d 898 (1973); *Jones v. Koulos*, 142 Colo. 92, 349 P.2d 704 (1960).

this conclusion. Expert testimony presented by Doctor James Piper suggested that while D.L.E. was presently suffering from periodic seizures, these seizures would not be life endangering unless they progressed to the medical state of status epilepticus, a state of continual seizures.[4] According to Doctor Piper, D.L.E.'s chances of progressing to status epilepticus were somewhere between 1 in 10,000 and 1 in 50,000, and he could not state with a reasonable degree of medical certainty whether D.L.E. would ever reach this state. *See Daugaard v. People*, 176 Colo. 38, 488 P.2d 1101 (1971). Consequently, we need not consider whether a finding of dependency or neglect would be precluded by section 19-1-114 where a minor's life was in imminent danger due to a lack of medical treatment.

We also note that the treatment of epileptic seizures involves potential dangers to the child which militate against treatment. Doctor Piper testified that the prescribed treatment for epileptic seizures included the long-term use of a drug commonly known as Dilantin. In the course of his testimony the doctor stated that a common side effect from the use of this drug is the reduced ability to produce bone marrow and red and white blood cells. On cross-examination he alluded to other reported side effects including gum hypertrophy, which is the swelling of the gum around the teeth; ataxia, which is unsteadiness of gait; and "headaches and other signs of increased cranial pressure known to medicine as pseudotumor cerebri."[5] According to Doctor Piper, the risk of experiencing these side effects is time and dose related and, since D.L.E. would have to take increasing amounts of Dilantin, the probability of their occurrence would increase in the future.[6]

Accordingly, we reverse the judgment of the juvenile court and remand this case with directions to vacate the order of dependency and to dismiss the petition.

---

[4] Doctor Piper testified that a given percentage of children who progress to status epilepticus will die due to a vascular swelling in the brain.

[5] Other common side effects caused by the use of Dilantin include allergic reactions, skin rash, drug fever, headaches, dizziness, slurred speech, confusion, muscle twitching, nausea, vomiting, constipation, joint aches and pains, and enlargement of lymph glands, and potential injury to the liver. J. Long, *The Essential Guide to Prescription Drugs*, 514 (1977). *See also* Gruber, *Diphenylhydantoionsodicum, U.S.P. (Dilantin)* in 4 *Cyclopedia of Medicine, Surgery, Specialties*, 645 (1961); *Gray's Attorney's Textbook of Medicine*, ch. 132, at 211-12 (3d Ed.).

[6] In *Morrison v. State*, 252 S.W.2d 97 (Mo. Ct. App. 1952), the Missouri Court of Appeals, considering a similar dependency issue, stated that:
"Where proposed treatment is dangerous to life, or there is a difference of medical opinion as to the efficiency of a proposed treatment or where medical opinion differs as to which of 2 or more remedies should be followed, requiring the exercise of sound discretion, the opinion of the parent should not be lightly overridden."