161 Ill. App.3d 765 (1987)
515 N.E.2d 286
In re E.G., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
E.G., a Minor, Respondent-Appellant).
Nos. 87-1791, 87-2065 cons.
Illinois Appellate Court  First District (3rd Division).
Opinion filed September 23, 1987.
*766 Harvey Grossman, Jane M. Whicher, and Diane Geraghty, all of Chicago, for appellant.
Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kenneth T. McCurry, and Joan E. Disis, Assistant State's Attorneys, of counsel), for the People.
Vacated in part; affirmed in part and modified in part.
JUSTICE WHITE delivered the opinion of the court:
On February 23, 1987, appellant E.G., a 17-year-old woman, was admitted to a hospital and diagnosed as having acute leukemia. When appellant and her parents were told that her treatment would include blood transfusions, they refused to consent to such treatment because of their religious beliefs. Appellant and her parents are Jehovah's Witnesses; they believe that the reception of transfusions would be a violation of a biblical prohibition against the consumption of blood. They consented to any other type of treatment.
Attending physicians contacted the office of the State's Attorney; that office filed a juvenile court petition seeking a finding that appellant was medically neglected and the appointment of a temporary guardian with the authority to consent to the required transfusions. On February 25, 1987, a temporary custody hearing was held to determine whether a guardian should be appointed. At that hearing, a physician who had examined appellant testified that if transfusion *767 therapy were not used, he would be "astonished" if appellant survived for an additional month. He also testified that appellant seemed to be mature, competent, and sincere in her religious beliefs, and that she apparently understood the consequences of refusing the recommended treatment. Additional testimony was given by the hospital official who was to take custody of appellant; the official concluded that appellant had independently decided to refuse transfusions. The court found probable cause to believe that appellant was medically neglected and appointed the hospital official temporary custodian with power to consent to all medical treatment. Appellant began receiving transfusions pursuant to this ruling.
The court called the case for reconsideration on April 8, 1987. Appellant testified that she had studied her faith for several years, and that she had been baptized at age 16, which made her an adult in the eyes of her church. Appellant also presented the testimony of a psychiatrist, who indicated that appellant had the maturity of an 18- to 21-year-old. The court delivered its final ruling on May 18, 1987. Though it expressly found that appellant was mature and had arrived at her decision independently, the court decided that the urgency of her condition justified a finding that she was medically neglected and adjudged her a ward of the court. The court's dispositional order reiterated its earlier ruling and ordered that a hospital official "be appointed guardian of the minor respondent with the right to consent to blood transfusions when advised of such necessity by any attending physician." That order is the subject of the instant appeal.
 1 Appellant claims that the trial court's "failure to extend to the Jehovah's Witness parties in this case a statutory benefit creates [sic] for parents who refuse medical treatment for their children because of a belief in spiritual healing violated the equal protection clause of the Fourteenth Amendment." Appellant contends that the court's finding of medical neglect would not have been entered had she been a member of certain other religious faiths. This argument is based on the following exception to the definition of medical neglect:
"A child whose parent, guardian or custodian in good faith selects and depends upon spiritual means through prayer alone for the treatment or cure of disease or remedial care may be considered neglected or abused, but not for the sole reason that his parent, guardian or custodian accepts and practices such beliefs." (Ill. Rev. Stat. 1985, ch. 23, par. 2054.)
This exception is contained not in the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701-1 et seq.), but in the Abused and Neglected Child Reporting Act, which requires health and welfare workers *768 to notify proper authorities when they have reason to believe that a child has been mistreated. (Ill. Rev. Stat. 1985, ch. 23, par. 2051 et seq.) Appellant claims that this exception also applies to the definition of medical neglect contained in the juvenile statute and interprets the exception to allow a member of a religion which practices faith healing to refuse medical treatment without being subject to a finding of medical neglect. She claims that the failure to include her own refusal of treatment in that exception denied her the equal protection of the laws.
We are unpersuaded by this argument. Though the Juvenile Court Act's definition of medical neglect is similar to that in the reporting statute, the former does not contain the exception which provides the basis for appellant's contention. We find nothing in the language of the juvenile act to suggest that its definition of medical neglect is to be read to incorporate any other statutory provisions. Our legislature may have intended to allow physicians to defer to religion-based refusals of medical treatment by excepting such refusals from the class of cases they are required to report; it may also have intended that those cases which do reach the juvenile justice system be subjected to a court's analysis, not automatically excluded from the court's jurisdiction by a statutory exception. We therefore decline to incorporate the exception of the reporting statute into the Juvenile Court Act, and conclude that no member of any other faith would have been entitled to exemption from a finding of medical neglect simply because of his religious beliefs. Accordingly, we reject appellant's claim that the finding of neglect in the case at bar violated the equal protection clause of our constitution.
 2 Appellant also contends that "the trial court's order requiring a seventeen year old mature minor to undergo compulsory blood transfusions in direct contravention of her religious beliefs and conscience violates rights guaranteed * * * under the First and Fourteenth amendments." In the court below, the State focused on testimony by appellant and other members of her faith which indicated that her church would view court-imposed transfusions as the court's transgression, not her own, and would support rather than punish her. This focus suggests that the juvenile court's action could be viewed as, at worst, a minimal infringement of appellant's religious freedom. We are compelled to explicitly state our disagreement with this suggestion. A Jehovah's Witness minister testified that the withholding of consent did not make transfusions a less difficult experience for one of his faith. He analogized appellant's suffering to that of a rape victim: "[J]ust because the person exonerated you in having participated *769 in it, it wouldn't mean that the trauma wasn't there. Forcing anyone to violate his consideration [sic] is the most painful indignity that an individual could have perpetrated against him." When appellant was informed that as a result of the temporary custody hearing she would be compelled to receive transfusions, she became upset and asked to be sedated before the treatment began.
Our supreme court, in In re Estate of Brooks (1965), 32 Ill.2d 361, 205 N.E.2d 435, addressed the question of whether such treatment could be forced upon an adult Jehovah's Witness in spite of her religious convictions:
"It seems to be clearly established that the First Amendment of the United States Constitution as extended to the individual States by the Fourteenth Amendment to that constitution, protects the absolute right of every individual to freedom in his religious belief and the exercise thereof, subject only to the qualification that the exercise thereof may properly be limited by governmental action where such exercise endangers, clearly and presently, the public health, welfare or morals." (32 Ill.2d 361, 372, 205 N.E.2d 435.)
In Brooks, the probate court appointed a conservator of the person of an adult Jehovah's Witness and authorized the conservator to consent to transfusions for the adult. This action was reversed by the supreme court:
"Even though we may consider appellant's beliefs unwise, foolish or ridiculous, in the absence of an overriding danger to society we may not permit interference therewith in the form of a conservatorship established in the waning hours of her life for the sole purpose of compelling her to accept medical treatment forbidden by her religious principles, and previously refused by her with full knowledge of the probable consequences. In the final analysis, what has happened here involves a judicial attempt to decide what course of action is best for a particular individual, notwithstanding that individual's contrary views based upon religious convictions. Such action cannot be constitutionally countenanced." 32 Ill.2d 361, 373, 205 N.E.2d 435.
The State argues that appellant, unlike the appellant in Brooks, is not an adult and is therefore subject to greater infringement of her constitutional freedom. Though we recognize the general validity of that proposition, we do not find it to be specifically responsive to the issues presented in the instant case, and we do not find the cases cited by the State to be dispositive of appellant's claim. Prince v. Massachusetts (1944), 321 U.S. 158, 88 L.Ed. 645, 64 S.Ct. 438, for *770 example, upheld a State's right to enforce child labor laws in spite of a claim of infringement of free exercise of religion. But the free exercise argument addressed by the Supreme Court was that of a guardian, not a child. The court did not rule that the child's religious freedom was appropriately curtailed, but that the guardian's freedom did not allow her to subject the child to whatever ill in the name of her own religion: "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." (321 U.S. 158, 170, 88 L.Ed. 645, 654, 64 S.Ct. 438, 444.) Our own supreme court, relying on Prince, has ruled that the State's interest in protecting an infant overrides the free exercise claim of Jehovah's Witnesses who refuse to consent to transfusions for their child. (People ex rel. Wallace v. Labrenz (1952), 411 Ill. 618, 104 N.E.2d 769.) Had the claim in the instant case involved only a claimed infringement of the religious freedom of appellant's parents, the State's interest would clearly prevail, but contrary to the State's argument, the cases cited do not settle the question of when restriction of a child's religious freedom is appropriate.
Recent decisions by the United States Supreme Court have suggested an answer to that question. Having ruled that an adult woman had the constitutional right to obtain an abortion, the court, in Planned Parenthood v. Danforth (1976), 428 U.S. 52, 49 L.Ed.2d 788, 96 S.Ct. 2831, was asked to decide if a State could restrict a minor's exercise of that right by requiring her to obtain parental consent for the operation. The court, though recognizing that States have broader authority to regulate the activities of children than of adults, stated that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." (428 U.S. 52, 74, 49 L.Ed.2d 788, 808, 96 S.Ct. 2831, 2843.) The court then concluded that the appropriate inquiry was whether there was a significant State interest in restricting a minor's access to abortion that was not present in the case of an adult. Since no sufficient State interest had been presented, the court ruled the restriction unconstitutional. (428 U.S. 52, 75, 59 L.Ed.2d 788, 808, 96 S.Ct. 2831, 2844.) In subsequent decisions, the court ruled that a State's interest in preventing immature minors from making such a grave decision justified some form of consent requirement, but that a State could not make a blanket determination that all minors below a certain age were too immature to make the decision independently, *771 and therefore had to allow mature minors to prove their maturity and make a decision without parental consent. City of Akron v. Akron Center for Reproductive Health (1983), 462 U.S. 416, 440, 76 L.Ed.2d 687, 709, 103 S.Ct. 2481, 2498; Belotti v. Baird (1979), 443 U.S. 622, 643, 61 L.Ed.2d 797, 813, 99 S.Ct. 3035, 3048.
We are unpersuaded by the State's attempt to distinguish the foregoing from the case at bar. Though the privacy rights examined in the abortion cases, as the State says, "have not been extended beyond reproductive matters," we believe that such an extension is inevitable. Given the paramount importance of religious freedom in the history of our nation, we find it difficult to consider seriously an argument that such freedom should be afforded less protection from government infringement than the rights at issue in the abortion cases.
Applying the Supreme Court's analysis to the instant case, we conclude that the Juvenile Court Act withstands a constitutional challenge based upon appellant's free exercise claim. The Act, in enumerating the dispositional orders a trial court may enter after finding a child to be neglected, includes the following: "A minor under 18 years of age found to be neglected under Section 2-4 may be * * * ordered partially or completely emancipated in accordance with the provisions of the `Emancipation of Mature Minors Act' * * * as now or hereafter amended." (Ill. Rev. Stat. 1985, ch. 37, sec. 705-2(d)(3).) The emancipation statute provides that a minor 16 years of age or over who has demonstrated the capacity to manage his own affairs may be partially or completely emancipated and granted whatever rights and responsibilities the court may specify. (Ill. Rev. Stat. 1985, ch. 40, sec. 2201 et seq.) The Act thus protects the State's interest in guarding immature minors while also allowing a mature minor to exercise the constitutional freedoms of an adult.
 3 The trial court's disposition in the instant case, however, cannot stand. The court found that appellant had made a mature, independent decision to follow her religious beliefs. This finding obviates any State interest in protecting immature minors, and no other State interest has been advanced that would not be present in the case of an adult. In the absence of such an interest, appellant cannot be prevented from exercising a constitutional right solely because of her minority. The trial court's order, therefore, though carefully considered and obviously prompted by concern for appellant's well-being, was an unjustified abridgment of her first amendment rights and must be vacated. We note that at the time of trial appellant was only six months from adulthood. Once the court found appellant to be mature and to have made the decision to refuse transfusions independently, the only *772 disposition which would have properly respected her constitutional right would have been an order empowering her to accept or refuse transfusions. We affirm the trial court's finding that appellant was medically neglected. Since we are authorized to enter any order which should have been entered by the trial court (Creek v. Clark (1980), 91 Ill. App.3d 429, 414 N.E.2d 816), we order appellant to be partially emancipated, and grant her the right to accept or refuse transfusions.
Vacated in part; affirmed in part and modified in part.
FREEMAN, J., concurs.
PRESIDING JUSTICE McNAMARA, dissenting:
I respectfully dissent from the majority holding which finds the trial court erred in not entering an order empowering the minor to refuse transfusions. I take issue with both the majority's statement of the law and its failure to address the findings of fact upon which the trial court based its decision.
In regard to the applicable law, the majority reasons that as a matter of law the trial court was required to refuse to intervene because the court found the minor made a "mature" decision. In fact, the trial court did not make such a finding. Consequently, no basis remains upon which the majority may reason that the trial court was required to permit the minor to make her own decision. Moreover, even if there were a finding of sufficient maturity to make medical decisions, neither Illinois law nor the Supreme Court abortion cases require Illinois courts, absent appropriate legislation, to adopt the "mature minor" doctrine in this area of law.
In regard to the relevant facts, the majority presents little discussion of the evidence and factual findings upon which the trial court based its decision. I review them here, however, in order to further demonstrate the propriety of the trial court's judgment that the transfusions were in the best interests of the minor. The evidence clearly shows that the minor would have died without the transfusions; that she willingly complied with the court-ordered transfusions; that her religious beliefs taught that membership in the congregation and the opportunity to redemption would not be endangered as long as the court compelled the transfusions; and that the recommended treatment is a generally acceptable course of treatment. The trial court carefully reviewed this evidence, along with the minor's expressed wishes and her relative maturity, and found the transfusions to be in her best interests. Under these circumstances, the appropriate *773 standard of review, which is not discussed by the majority, requires this court to affirm the trial court decision in its entirety.
The general principles underlying the decisions in this area of law provide important background to the present case. The majority fails to mention these well-established policies and duties of the court. An adult may not be forced to undergo medical treatment forbidden by his religious principles. (In re Estate of Brooks (1965), 32 Ill.2d 361, 205 N.E.2d 435.) In contrast, it is well established that the State may compel medical treatment for a minor, notwithstanding the parents' religious beliefs. (People ex rel. Wallace v. Labrenz (1952), 411 Ill. 618, 104 N.E.2d 769, cert. denied (1952), 344 U.S. 824, 97 L.Ed. 642, 73 S.Ct. 24.) A decision to refuse lifesaving medical treatment for a minor must yield to the State's interest as parens patriae in protecting the health and welfare of the child. (People ex rel. Wallace v. Labrenz (1952), 411 Ill. 618, 104 N.E.2d 769, see generally Annot., 52 A.L.R.3d 1118 (1973); 42 Am.Jur.2d Infants, sec. 16 (1969).) Parents are not free to make martyrs of their children "before they reach the age of full and legal discretion when they can make that choice for themselves." Prince v. Massachusetts (1944), 321 U.S. 158, 170, 88 L.Ed. 645, 654-55, 64 S.Ct. 438, 444.
Absent express constitutional inhibition, the age at which a minor shall be deemed to have the legal capacity to do anything or perform an act is wholly a matter within the power of the legislature. (Jacobson v. Lenhart (1964), 30 Ill.2d 225, 195 N.E.2d 638, citing In re Morrisey (1890), 137 U.S. 157, 34 L.Ed. 644, 11 S.Ct. 57, and People ex rel. Chicago Title & Trust Co. v. Kowalski (1923), 307 Ill. 378, 138 N.E. 634.) The State's authority to intervene typically is based upon statutes permitting a court to declare that a child is neglected. See, e.g., Ill. Rev. Stat. 1985, ch. 37, par. 702-5; see generally 47 Am.Jur.2d Juvenile Courts and Delinquent and Dependent Children, secs. 29-33 (1969).
In the present case, the trial court properly considered the Juvenile Court Act's purpose to secure for minors such care and guidance as will serve the moral, emotional and physical welfare of the minor. (Ill. Rev. Stat. 1985, ch. 37, par. 701-2.) The court correctly stated that every child has a right to services necessary to her proper development, including necessary medical treatment. (Ill. Rev. Stat. 1985, ch. 37, par. 701-2.) At any time during temporary custody, the court may authorize a physician or hospital to provide medical care necessary to safeguard the minor's life or health. (Ill. Rev. Stat. 1985, ch. 37, par. 703-8.) The parents' rights shall not prevail when the court determines that they are contrary to the best interests of the child. *774 (Ill. Rev. Stat. 1985, ch. 37, par. 701-2.) These are legitimate interests well within the power of the State to implement. Stanley v. Illinois (1972), 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208; see also Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053 (State has three interests which support decision to order lifesaving medical treatment for minor; interest in protecting welfare of children living within its borders; interest in the preservation of life; interest in protecting integrity of medical profession).
The trial court here recognized that it is the duty of the court to act solely in the best interests of the child and for the child's own protection. (In re Brooks (1978), 63 Ill. App.3d 328, 379 N.E.2d 872.) As a matter of public policy, the courts must carefully guard the rights of minors so as to give them maximum protection. (In re Sneed (1977), 48 Ill. App.3d 364, 363 N.E.2d 37, aff'd (1978), 72 Ill.2d 326, 381 N.E.2d 272.) Moreover, the Act is generally construed liberally to favor inclusion, rather than exclusion, of a minor. In re Greene (1979), 76 Ill.2d 204, 390 N.E.2d 884.
Initially, I disagree with the majority's statement, upon which its entire analysis rests, that the trial court found the minor to be mature enough to make her own medical decisions. The record shows that the court made only two statements on this subject. It first said, "I realize she is a mature 17 year old individual." It later said, "The court finds that [the minor] reached her decision about her religious beliefs and her refusal to accept blood on an independent basis." The court made no connection between the two statements, or about the maturity of the decision to refuse transfusions. The majority, however, combines the separate statements about maturity and the independent decision, to read, "The court found that appellant had made a mature, independent decision to follow her religious beliefs." In the trial court's extensive findings, the only other statement even remotely related to the court's evaluation of the minor's maturity is: "And the court who hears this petition * * * considers all aspects of the matter such as the child's religion, their beliefs, the parents' beliefs and the wishes of the child and the parent, and we consider the maturity of the minor * * *." The court also noted that several witnesses found the minor to be a mature 17-year-old, and Dr. Littner found she was as mature as an 18- to 21-year-old. The trial court was not required, however, to adopt these opinions.
Dr. Littner's opinion, for example, was undermined by his definition of a mature person to be any individual whose psychological, emotional development matched his chronological age. He explained that "to a psychiatrist, a 5 year old child could be considered mature *775 under that definition." In order to evaluate the maturity of a 17-year-old, he would look for certain "conflicts [which] are confronting the young lady. These have to do with the question she is on the verge of moving into dependence. Considering her future in terms of vocational interest and consider the question of what she wishes to do about her social life." For example, the minor here testified in February 1987 that she was a high school junior and planned to go to summer school in order to complete her junior year. Next year she plans to graduate from high school, work in word processing, and become a pioneer for a church, which entails going out into the community for 90 hours a month.
Dr. Littner concluded that the minor was "at least a mature 17 year old. And actually I felt that she had the maturity of someone between the ages of 18 and 21." He based his opinion on the way "she responded to my questions about what she wanted for herself and her future. How she looked upon herself in terms of getting married. The questions that have to do with future and dependence and future married life." Ironically, therefore, the minor's plans and hopes for her future years of adulthood constituted the basis of Dr. Littner's opinion that the minor was mature enough to select a course of medical treatment which ensures her death prior to reaching her eighteenth birthday.
Thus, the court did not conclude that the minor was so mature that as a matter of law it was required to refuse to intervene. In fact, the court expressly stated that she was a minor and therefore she would not make the final decision. The court also indicated that outward appearances and expressed beliefs often do not reflect the individual's true wishes. The court was entitled to consider all the evidence, including the witnesses' demeanor and credibility, evaluate the value of the testimony, and resolve factual questions. "I still couldn't see inside of that woman. She might appear strong for that moment, and I * * * couldn't let it change my opinion."
The majority also apparently relies on the trial court's statement that it was impressed by the minor's testimony. For example, the minor testified that she did not fear death because "the Bible shows how your death is just like being asleep, and the dead aren't conscious of nothing. So I'm not afraid of it." The trial court indicated to the mother that her daughter was a "sincere, devoted, outstanding young lady. Imagine being this sick and having the quiet and the peacefulness of heart to be able to accept it gradually and without being upset in any outward manner. * * * She can accept death without problems because she has belief. She believes in her religion." The court did *776 not, however, indicate that its admiration of a child's composure and sincerity in the face of a serious illness compelled a finding that she was mature enough to be declared partially emancipated and elect to forego lifesaving medical treatment.
The majority maintains that under the "mature minor" doctrine, the minor in the present case should be allowed to make her own decision concerning the blood transfusions. (See, e.g., Brown & Truitt, The Right of Minors to Medical Treatment, 28 De Paul L. Rev. 289 (1979).) The Supreme Court has expressed concern for the inability of children to make mature choices. The States may validly limit the freedom of minors to choose for themselves in the making of important affirmative choices with potentially serious consequences because it is well recognized that during the formative years of childhood and adolescence minors often lack the experience, perspective and judgment to recognize and avoid choices that could be detrimental to them. Bellotti v. Baird (1978), 443 U.S. 622, 636-37, 61 L.Ed.2d 797, 809-10, 99 S.Ct. 3035, 3044-45.
The majority turns to the abortion decisions after asserting that those cases "have suggested an answer" (161 Ill. App.3d at 770) while acknowledging that the abortion cases "have not extended beyond reproductive matters" (161 Ill. App.3d at 771). The majority boldly predicts, however, that "such an extension is inevitable." (161 Ill. App.3d at 771.) Notably, the majority offers no authority for its conclusion. Instead, it merely highlights the importance of religious freedom, and recites that it is "difficult to consider seriously an argument that such freedom should be afforded less protection from government infringement than the rights at issue in the abortion cases." 161 Ill. App.3d at 771.
I believe that the analogy drawn between the medical neglect cases and the abortion cases rests upon unsound reasoning. Significantly, one recent Supreme Court abortion decision expressly distinguished abortion regulations from the type of child neglect statute relied upon by the trial court in the present case. In City of Akron v. Akron Center for Reproductive Health, Inc. (1983), 462 U.S. 416 n. 31, 76 L.Ed.2d 687, 703 n. 13, 103 S.Ct. 2481, 2493 n. 13, the court noted that the Ohio neglect statute made no provision for a mature or emancipated minor, nor suggested that a juvenile court had the authority to inquire into a minor's maturity. Absent this protection in both the neglect statute and the abortion ordinance, the ordinance was found to be unconstitutional. See also Planned Parenthood v. Danforth (1976), 428 U.S. 52, 73, 49 L.Ed.2d 788, 807, 96 S.Ct. 2831, 2843 (finding Missouri abortion regulations unconstitutional notwithstanding *777 the existence of other statutes, such as those relating to neglected children, which reflected the interest of the State in assuring the welfare of minors).
The court has also recognized a distinction between the consent procedures for a minor's abortion and the consent procedures for other types of medical treatment. In Bellotti v. Baird (1976), 428 U.S. 132, 151, 49 L.Ed.2d 844, 858, 96 S.Ct. 2857, 2868, the court held that abortion cases are of a unique character and are an exception to the general rule that a State may require a minor to wait until the age of majority before being permitted to independently exercise certain legal rights.
Moreover, even under the abortion decisions, minors who are not expressly found to be "mature" enough to give informed consents must show the abortion is in their best interests. (Bellotti v. Baird (1979), 443 U.S. 622, 61 L.Ed.2d 797, 99 S.Ct. 3035; see also Wynn v. Scott (N.D. Ill. 1978), 448 F. Supp. 997, aff'd (7th Cir.1978), 582 F.2d 1375.) Here, the trial court did not find the minor capable of making an informed, mature decision regarding medical treatment. Instead, it indicated that in the nine months prior to her eighteenth birthday the minor was clearly capable of changing her mind. The court determined that it was in the minor's best interest to receive the transfusions.
In addition, allowing a "mature minor" to consent to an abortion permits an affirmative act by the minor. The giving of abortions presents a unique problem which results in the termination of the minor's pregnancy. From the minor's point of view, potential physical or psychological damage can be treated with good medical care and counseling. The alternative to making abortions available to mature minors is the birth of a child. In contrast, allowing a "mature minor" to refuse to consent to blood transfusions permits a negative act by the minor. The denial of transfusions results in the termination of the minor's life. Potential physical or psychological damage does not exist and cannot be treated with counseling in light of the drastic consequence of withholding the transfusions based on the minor's decision. The alternative to withholding transfusions from mature minors, therefore, is the death of the minor.
The Illinois legislature, like many other States, has not adopted "mature minor" legislation. (See, e.g., Ark. Stat. Ann. sec. 82-363 (1976); Miss. Code Ann. sec. 41-41-3(h) (1972).) I believe the question of whether judicial promulgation of such a doctrine is appropriate in Illinois is a question we need not reach here. It is enough to show that the trial court decision is not wrong as a matter of law, and that *778 its findings are not against the manifest weight of the evidence.
For these reasons, I disagree with the majority's statement and application of the relevant law. In regard to the factual support for the trial court's decision, the majority fails to examine the evidence using the applicable standard of review.
The trial court's findings in a child neglect case are entitled to great deference and respect by the reviewing court. (In re Harrison (1983), 120 Ill. App.3d 108, 458 N.E.2d 146.) The trial court decision will not be overturned unless it is against the manifest weight of the evidence. (In re Hill (1981), 102 Ill. App.3d 387, 430 N.E.2d 75.) The scope of review is limited to a determination of whether the findings are supported by the record and a determination as to whether the facts justify the entry of the order appealed from. (In re Bartha (1967), 87 Ill. App.2d 263, 230 N.E.2d 886. See also Smith v. Seibly (1967), 72 Wash.2d 16, 431 P.2d 719 (whether a person has mental capacity necessary to consent to medical treatment is a question for the trier of fact).) The juvenile court is uniquely qualified to evaluate the credibility of the witness' testimony and opinions, and to believe them in whole or in part. This court is not in a position to sit as a super trier of fact. In the present case, the evidence relevant to a variety of factors to which the court must address itself in a medical neglect case overwhelmingly supports the decision that the transfusions are in the best interests of the minor. See In re Willmann (1986), 24 Ohio App.3d 191, 493 N.E.2d 1380.
Several factors which strongly indicate that judicial intervention is in the minor's best interests are the life-threatening condition from which she suffers; her willingness to comply with the court-imposed treatment; and her religious beliefs that her standing in the church and chances for redemption are not endangered as long as the court compels the transfusions. Other factors properly considered include the fact that the medical treatment recommended is a standard, generally accepted course of treatment. This depends upon whether other alternatives exist, whether the treatment could be successful, and whether the treatment poses a significant amount of risk. (See Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053 (factors to consider include whether condition is life-threatening and whether the proposed treatment exposes the minor to great risk); In re Phillip B. (1979), 92 Cal. App.3d 796, 156 Cal. Rptr. 48, cert. denied (1980), 445 U.S. 949, 63 L.Ed.2d 784, 100 S.Ct. 1597 (factors to consider before a State compels medical treatment include seriousness of harm minor faces, evaluation of the treatment by the medical profession, risks involved in recommended treatment, *779 and preferences of parents and of minor).) Significantly, in reviewing these factors the underlying consideration is always concern for the child's welfare and whether her best interests will be served by compelling the medical treatment. In re Phillip B. (1979), 92 Cal. App.3d 796, 156 Cal. Rptr. 48.
In regard to the first factor, whether the transfusions are necessary to save the child's life, the Supreme Court has consistently held that religious beliefs alone cannot support a decision which threatens the health of the child. In Prince v. Massachusetts, the court held that the right to practice religions freely does not include the liberty to expose a child to ill health or death. In Jehovah's Witnesses v. King County Hospital Unit No. 1 (W.D. Wash. 1967), 278 F. Supp. 488, aff'd per curiam (1968), 390 U.S. 598, 20 L.Ed.2d 158, 88 S.Ct. 1260, the court relied upon the Prince rationale and held that parents could not exercise religious freedom by endangering the lives of their children. See also Wisconsin v. Yoder (1972), 406 U.S. 205, 32 L.Ed. 15, 92 S.Ct. 1526 (parents may exercise religious freedom in regard to mandatory education because the parental decisions did not jeopardize the health of the children).
In overturning the trial court order compelling blood transfusions for the minor, the majority ignores the large body of law in which the courts have uniformly permitted intervention where the medical treatment sought is necessary to save the minor's life. See, e.g., Jehovah's Witnesses v. King County Hospital Unit No. 1 (W.D. Wash. 1967), 278 F. Supp. 488; Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053; JFK Hospital v. Heston (1971), 58 N.J. 576, 279 A.2d 670; State v. Perricone (1962), 37 N.J. 463, 181 A.2d 751, cert. denied (1962), 371 U.S. 890, 9 L.Ed.2d 124, 83 S.Ct. 189; People ex rel. Wallace v. Labrenz (1952), 411 Ill. 618, 104 N.E.2d 769; In re Willman (1986), 240 Ohio App.3d 191, 493 N.E.2d 1380; Crouse Irving Memorial Hospital, Inc. v. Paddock (1985), 127 Misc.2d 101, 485 N.Y.S.2d 443; In re D.L.E. (Colo. 1982), 645 P.2d 271, earlier appeal (1980), 200 Colo. 244, 614 P.2d 873; In re Hamilton (Tenn. App. 1983), 657 S.W.2d 425; In re Ivey (Fla. App. 1975), 319 So.2d 53; Muhlenberg Hospital v. Patterson (1974), 128 N.J. Super. 498, 320 A.2d 518; In re Clark (1962), 21 Ohio Op.2d 86, 185 N.E.2d 128; Hoener v. Bertinato (1961), 67 N.J. Super. 517, 171 A.2d 140; Morrison v. State (Mo. App. 1952), 252 S.W.2d 97.
In contrast, courts typically have shown great reluctance to intervene where the minor's condition is not life threatening. See, e.g., Weber v. Stony Brook Hospital (1983), 60 N.Y.2d 208, 456 N.E. 1186, 469 N.Y.S.2d 63, cert. denied (1983), 464 U.S. 1026, 78 L.Ed.2d 732, *780 104 S.Ct. 560; In re D.L.E. (1980), 200 Colo. 244, 614 P.2d 873, later appeal (Colo. 1982), 645 P.2d 271; In re Seiferth (1955), 309 N.Y. 80, 127 N.E.2d 820; In re Green (1972), 448 Pa. 338, 292 A.2d 387, later appeal (1973), 452 Pa. 373, 307 A.2d 279; In re Frank (1952), 41 Wash.2d 294, 248 P.2d 553; In re Hudson (1942), 13 Wash.2d 673, 126 P.2d 765; Aronson v. Superior Court (1987), 191 Cal. App.3d 294, 236 Cal. Rptr. 347; see generally Annot., 52 A.L.R.3d 1118 (1973).
The majority disregards this key factor, which distinguishes the present case from every case where a court refused to intervene in a minor's medical care. The majority fails to even recite the evidence presented which so strongly indicates the importance of this factor. Dr. Yachnin testified that on the morning of the hearing, the minor had only one-fifth to one-sixth of the normal oxygen-carrying capacity in her blood. The oxygen supply to her brain was so seriously impaired that she was often incoherent. The slightest physical movement resulted in extreme fatigue, and thus she was bedridden. A normal platelet level is between two and three hundred thousand. The minor's platelet level was only fifteen thousand. Dr. Yachnin opined that if the minor did not receive blood transfusions, she could die at any moment. She had no chance of going into remission without blood transfusions and chemotherapy. "I would be surprised if she were to live at the end of two weeks, and I would be astonished if she were alive at the end of a month."
Another relevant factor in determining whether it is in the best interests of a minor to compel medical treatment is whether the minor will cooperate and comply with the court order. A trial court might find, for example, that the testimony is "revealing" in that it permits an inference that the apparently steadfast and inflexible religious beliefs in regard to medical care are actually somewhat flexible and pragmatic. See, e.g., In re Hamilton (Tenn. App. 1983), 657 S.W.2d 425 (court finds it revealing that, on religious grounds, father refuses to consent to use of medicine for treatment of his 12-year-old daughter's cancer, yet the father also testified that "if a doctor were to tell me he had a medicine that would heal me, I'd go right there in just a minute but there ain't none").
The minor here cites a California trial court case as the "only known decision with comparable facts to those presented in this case." (In re D.P. (Superior Court of the State of California, Santa Clara County, July 3, 1986) No. 91590.) I find the facts in In re D.P. actually support the trial court decision here. In that case, a 14 1/2-year-old with cancer refused a treatment plan involving blood transfusions *781 based on her religious beliefs as a Jehovah's Witness. Unlike the present case, D.P. adamantly refused the treatment even if it was ordered by the court. In that event, she would leave the hospital. The court found it doubtful that court-ordered transfusions could be carried out, as they could not force her to remain in the hospital against her will for months at a time. In re D.P. (Superior Court of the State of California, Santa Clara County, July 13, 1986) No. 91590; see also In re Seiferth (1955), 309 N.Y. 80, 127 N.E.2d 820 (court would not order surgery for 14-year-old boy's cleft palate and harelip over religious-type objections of boy and father, because condition was not life threatening and success of the procedure demanded the boy's cooperation with physicians and speech therapists); but see In re D.L.E. (Colo. 1982), 645 P.2d 271 (where court found a 16-year-old boy to be dependent and neglected after the boy's refusal, on religious grounds, to comply with a program of medical treatment for epilepsy endangered his life).
In contrast to these cases, the minor here has accepted the numerous court-ordered transfusions since February 25, 1987. Dr. Yachnin testified that he could not treat the minor unless she cooperated. Dr. Littner testified that the minor would comply with the court's decision. At the February 25, 1987, hearing, it was counsel for the minor who suggested that the hospital give the minor blood transfusions until a time when the hearing could be continued. Counsel expressed the hope that with some initial blood transfusions, the minor might be strong enough to testify. After the minor received 9 or 10 transfusions, she testified in court that she felt better and was no longer bedridden. The minor, then, was clearly willing to comply with the court order.
Another relevant factor which the trial court was entitled to consider is that the minor's religious beliefs taught her that the church membership and her chance for redemption would not be disturbed as a result of the court-ordered treatment. Under the best interests analysis, a court must focus on the various factors unique to the situation of the minor for whom it must act. (Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053.) The minor here testified that if she voluntarily agreed to the transfusions, she would be put out of the congregation. In contrast, if the court compelled her to have the transfusions, she could continue as a member of the congregation. The minister testified that in such an event, the congregation would treat her with great love, consideration and sympathy.
The minor testified further that if the blood transfusions were continued she would still be troubled and express verbal objections *782 only because of her awareness that someone, in this case the court, was breaking Jehovah's law. The minor also testified that when she was first informed of the court order she was "upset" because "it seems as if everything that I wanted or believed in was just being disregarded." In my opinion, however, this remark did not require the trial court to find the continued transfusions were not in the minor's best interests.
Another factor relevant to the determination as to whether judicial intervention is necessary concerns the medical propriety of the treatment in question. Where a minor is involved, a court may consider whether or not the medical care being offered is an acceptable course of treatment in light of the surrounding circumstances. See In re Hofbauer (1979), 47 N.Y.2d 648, 393 N.E.2d 1009, 419 N.Y.S.2d 936; Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053; Morrison v. State (Mo. App. 1952), 252 S.W.2d 97; Cooper v. Wiley (1987), 128 A.D.2d 455, 513 N.Y.S.2d 151; In re Hamilton (Tenn. App. 1983), 657 S.W.2d 425.
In the present case, the State offered strong evidence to demonstrate that the six months of treatment involving blood transfusions and chemotherapy was an ordinary, medically indicated course of treatment for leukemia. (See Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053.) The treatment provided the minor with an 80% chance of attaining remission and some hope of cure; the risks were relatively slight; and no other alternative existed. Compare Custody of a Minor (1978), 375 Mass. 733, 379 N.E.2d 1053 (suggested treatment was only available medical treatment offering a hope for cure, and the risks of treatment were minimal when compared to the consequences of allowing the leukemia to go untreated) with In re D.P. (Superior Court of the State of California, Santa Clara County, July 13, 1986) No. 91590 (where alternative modified treatment plan was available without resorting to transfusions, although chances for survival under the modified plan were less predictable than under the recommended treatment plan).
The majority has disregarded the body of law relating to consent for a minor's lifesaving medical treatment, the relevant factors which the trial court must consider, the policies underlying the Juvenile Court Act, and the relevant standard of review. I believe that the trial court properly reviewed the relevant factors and, based on the evidence presented, did not abuse its discretion in finding that the transfusions were in the minor's best interests. Refusing to intervene guaranteed the minor's death; the minor readily complied with the order compelling treatment; and under the minor's beliefs, the court-ordered *783 treatment posed no danger to her church membership or chances of redemption. Under these circumstances, I believe the trial court did not err in finding that the religious objections must yield to the overall welfare and best interests of the child.
For these reasons, I dissent from the majority holding. I would affirm the trial court decision in its entirety.