**Jon C. LYBARGER, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 90SC2.**

Supreme Court of Colorado, En Banc.

March 18, 1991.

Rehearing Denied April 8, 1991.

David F. Vela, Colorado State Public Defender, Michael J. Heher, Deputy State Public Defender, Denver, for petitioner.

Gale A. Norton, Atty. Gen., Ray Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Denver, for respondent.

Hamilton, Myer, Swanson & Faatz, P.C., Dwight A. Hamilton, Valerie W. Kenney, Denver, for amicus curiae The Church of Christ.

Justice QUINN delivered the Opinion of the Court.

This case is before us a second time for review of the conviction of the defendant, Jon C. Lybarger, for felony child abuse resulting in death. In *People v. Lybarger*, 700 P.2d 910 (Colo.1985), we reversed the defendant's conviction due to the trial court's striking *sua sponte* the affirmative defense of "treatment by spiritual means" created by section 18–6–401(6), 8B C.R.S. (1986), and we remanded the case for a new trial. On remand, the defendant was again convicted of child abuse resulting in death. During the second trial, the trial court instructed the jury that it was its function to determine whether the "treatment by spiritual means" defense was available to the defendant and that the defense was not available if the prosecution established beyond a reasonable doubt the essential elements of the crime of child abuse resulting in death. The court of appeals, in affirming the defendant's conviction, held that the affirmative defense was not applicable to the defendant because there was evidence "that a reason other than spiritual treatment existed to consider the child endangered ..." and that the trial court's instructions on the affirmative defense did not constitute plain error. *People v. Lybarger*, 790 P.2d 855, 860 (Colo.App.1989).

We granted the defendant's petition for certiorari to consider the court of appeals' resolution of this case. We now reverse the judgment of the court of appeals and remand the case for a new trial.

## I.

The defendant was charged with child abuse resulting in the death of his five-week-old daughter, Jessica, in that between March 13 and 15, 1982, he recklessly or with criminal negligence caused or permitted the child to be placed in a situation that endangered the child's life and health and that resulted in the child's death. The evidence on retrial was not substantially different from the evidence presented at the first trial, and we set forth here only so much of it as is pertinent to our resolution of the questions before us.

The defendant lived with his wife and nine children in a small cabin in the Estes Park area. Since approximately 1980 the defendant had been on a "walk of faith," which he described as a total reliance on God for all needs and for healing in times of illness or injury. He was a recognized minister in the Word of Faith Evangelistic Association, a small fundamentalist Christian religious organization which had members in Colorado, Arkansas, and Kansas. For some time the defendant had attended the Faith Chapel Church in Estes Park, but later began a separate ministry of his own and conducted weekly religious services in his cabin.

The theological foundation of the Evangelistic Association was described by an elder in the association, Sammie Ferdinandsten, as follows: "We just believe in God's word, which is written in what is considered the Bible, as all of God's word [H]e intended for us to have; and that we believe it all, New Testament, Old Testament, and that it is all true ..." The tenets of the Word of Faith Evangelistic Association included healing of the sick by prayer, which the defendant and other members of the association considered to be scripturally based. Members of the Evangelistic Association were permitted but were not required to rely solely on prayer as a means of treating sickness. In accordance with his religious beliefs, the defendant and his wife relied on spiritual treatment through prayer when their children became ill.

During March 1982 the defendant's five-week-old daughter, Jessica, was fighting cold symptoms. Other members of the defendant's family had come down with similar symptoms earlier in the year and in the defendant's view had recovered because of prayer, so at this time he was not particularly concerned that his baby's condition might be more serious than a common cold. On Saturday, March 13, however, the defendant observed that the baby was coughing more frequently. He accordingly contacted a church elder and asked him to contact Sammie Ferdinandsten so that they could pray for the child. Ferdinandsten and another church member, Robert McGillicuddy, drove to the defendant's home. When they arrived there, they observed that the baby had some congestion but was not feverish and appeared to be breathing without too much difficulty. The defendant, Ferdinandsten, and McGillicuddy anointed the baby with oil, laid their hands on her head, and prayed for her healing.

Shortly thereafter, two officers of the Larimer County Sheriff's Department arrived at the defendant's home after receiving an anonymous call that the baby was ill. The officers initially contacted the defendant and then examined the baby. They saw no signs of illness other than a slight congestion and determined that the child's condition was not such as to warrant contact with the Department of Social Services. The officers called Ferdinandsten outside the cabin and asked him whether the defendant would refuse to provide medical care for the baby. Ferdinandsten stated, "I don't think so, but I will ask him." When Ferdinandsten questioned the defendant about this matter, the defendant stated: "No, I would refuse no help for my baby. I think that I have helped my baby and that God is the best help for my baby." The officers, Ferdinandsten, and McGillicuddy eventually left the defendant's home.

The following morning the baby's condition showed signs of worsening. When breast feeding the baby, Mrs. Lybarger noticed that the baby had coughing spells and seemed to be choking. Because Mrs. Lybarger was exhausted from caring for several sick children and because the wood-burning stove in the cabin might be drying the cabin air and aggravating the baby's cough, the defendant and his wife decided to take the baby to the home of the McGillicuddys. Upon their arrival, Mrs. McGillicuddy, who was a licensed practical nurse, noticed that the baby looked very pale and weak and, thinking that the baby might be suffering from viral pneumonia, she told her husband that the baby should be taken to a hospital. When Mr. McGillicuddy relayed this information to the defendant, the defendant stated: "We can't.... This is our walk and this is our life." Later in the evening the McGillicuddys urged the defendant and his wife to get some rest while Mrs. McGillicuddy watched the baby. While the Lybargers were resting Mrs. McGillicuddy became extremely concerned over the baby's condition and again told her husband that the baby should be taken to the hospital.

The next morning, which was Monday, Mr. McGillicuddy talked to the defendant about taking the baby to the hospital. The defendant, however, declined the suggestion, pointing out that the baby "looked 100 percent better than five hours before." Mr. McGillicuddy examined the baby at this time and also was of the view that the baby's condition had been reversed and the child was "on the way to good health." The baby seemed to be clearing phlegm from its throat, appeared more active, and showed signs of improving. When Mrs. Lybarger later sat with the baby, she noticed that the baby seemed peaceful, was breathing adequately, and was able to take fluids. Later in the day, however, the baby began to have difficulty breathing. Mrs. McGillicuddy became concerned that the baby might be taking her last breaths and tried to pat the baby on its back to see if something might dislodge from the baby's throat. Shortly thereafter the baby died.

An autopsy disclosed that the cause of death was respiratory failure due to "acute necrotizing bronchial pneumonia." A pediatrician testified that the onset of such an illness is usually sudden, over a day or a week at most. The symptoms that differentiate pneumonia from the common cold, according to the pediatrician, are very rapid respiration, an ashen or blue color around the face and fingernails or fingertips, lethargy, and an inability to feed. While the presence of a high fever would also be consistent with pneumonia, the pediatrician testified that fever may not be present in very young babies or babies who are extremely ill and unable to generate sufficient body metabolism to cause a fever. Another physician testified that the baby would have survived if she had received treatment on March 13, that she would have had a slightly better than fifty percent chance of recovery if she had been treated on or before 5:00 p.m. on March 14, and that she would have had some chance of recovery if treated a few hours before her death.

At the conclusion of the evidence the trial court conducted a conference with counsel for the purpose of settling jury instructions. The court stated that if it were to rule on the applicability of the "treatment by spiritual means" defense to this case, its ruling would be that the defense was inapplicable because "the evidence does not establish that the Defendant, as such, was a duly accredited practitioner" of a recognized church or "that the child was being treated solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination." The court went on to state, however, that in the interest of fairness it would modify the affirmative defense instruction and submit the defense to the jury in a modified form by adding a second paragraph to the elemental instruction on child abuse resulting in death (Instruction 9). As so modified, Instruction 9 stated:

A person commits the crime of Child Abuse Resulting in Death if:

He recklessly, or with criminal negligence, causes or permits a child to be

placed in a situation that endangered the child's life or health, and the death of the child results.

The elements of Child Abuse Resulting in Death are therefore:

(1) Recklessly or through criminal negligence,

(2) Causing or permitting a child to be placed in a situation that endangered the child's life or health,

(3) The death of the child results, and

(4) Without the affirmative defense described in Instruction No. 11.

If, after considering all the evidence, you find that the prosecution has established beyond a reasonable doubt that the Defendant, Jon Courtland Lybarger, acted in such a manner so as to satisfy all the above elements at or about the date and place stated in the Information and that the affirmative defense is not available to the Defendant, you should find the Defendant guilty of Child Abuse Resulting in Death. If you find that any of the elements have not been proven beyond a reasonable doubt or that the affirmative defense is applicable[,] you should find the Defendant not guilty of Child Abuse Resulting in Death.

The court also stated that it would give the following instruction (Instruction 11) on the "treatment by spiritual means" defense:

A child who in good faith is being treated solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not for that reason alone be considered to be "endangered" as required by Instruction No. 9.

However, the above stated affirmative defense is not available to the Defendant if the People prove beyond a reasonable doubt that under the circumstances the defendant, Jon Courtland Lybarger, consciously disregarded a substantial and unjustifiable risk of death to Jessica Ann Lybarger if she did not receive available medical care or grossly deviated from a standard of reasonable care in failing to perceive the child's condition and the need for immediate medical attention to the child.

The defendant objected to the second paragraphs of Instructions 9 and 11 on the basis that both instructions virtually removed the affirmative defense from the jury's consideration as long as the prosecution established all the essential elements of the crime and thus relieved the prosecution of its burden to establish the defendant's guilt as to the affirmative defense. The trial court overruled the defendant's objections and submitted both instructions to the jury, along with the following instruction (Instruction 12):

If you find that the evidence presented in this case has raised the issue of the affirmative defense as described in Instruction No. 11[,] the prosecution then has the burden of proving beyond a reasonable doubt that the affirmative defense is not applicable to the Defendant or his conduct.

After considering the evidence concerning the affirmative defense, with all the other evidence in this case, if you are not convinced beyond a reasonable doubt of the Defendant's guilt, you must return a verdict of not guilty.

The jury found the defendant guilty as charged, and the court sentenced him to a six-year term of probation. The court of appeals affirmed the judgment of conviction. Addressing the trial court's instruction on the affirmative defense of "treatment by spiritual means" (Instruction 11), the court of appeals held as follows:

The instruction at issue informed the jury that if the prosecution proved beyond a reasonable doubt that a reason other than spiritual treatment existed to consider the child endangered, then the defendant was not entitled to the benefit of the affirmative defense in § 18–6–401(6). This was a correct statement of law, and the trial court did not err by giving the instruction.

*Lybarger*, 790 P.2d at 860. The court then went on to hold that the defendant failed to object to several of the other instructions, including the instructions on the jury's role in determining whether the affirmative de-

fense of "treatment by spiritual means" was "available to the defendant," and concluded that the instructions did not constitute plain error. *Id.* Because the court of appeals resolved the propriety of the jury instructions on the affirmative defense under a plain-error analysis, the court found it unnecessary to consider the defendant's constitutional challenges to the limitation of the "treatment by spiritual means" defense to a "duly accredited practitioner" of "a recognized church or religious denomination."[1] We thereafter granted the defendant's petition for certiorari to consider two questions: whether the court of appeals was correct in its interpretation of the "treatment by spiritual means" defense and in its rejection of the defendant's challenges to the trial court's instructions on that defense; and whether the statutory limitation of the "treatment by spiritual means" defense to a duly accredited practitioner of a recognized church or religious denomination violates the United States and Colorado Constitutions. Because we conclude that the affirmative defense was applicable to this case and that the trial court erroneously instructed the jury on that defense, we do not address the constitutional claims raised by the defendant.

## II.

Our analysis must begin with the statutory scheme relating to the crime of child abuse resulting in death and to the affirmative defense of "treatment by spiritual means" as that defense existed on March 15, 1982, the date on which the Lybarger child died.

### A.

Section 18–6–401(1), 8B C.R.S. (1986), provides that a person commits child abuse if that person "causes an injury to a child's life or health or permits a child to be unreasonably placed in a situation which poses a threat of injury to the child's life or health." When death results to the child, the crime is a class 2 felony if the offender acted recklessly, and a class 3 felony if the offender acted with criminal negligence. §§ 18–6–401(7)(a)(I) & (II), 8B C.R.S. (1986). Then, as now, the culpable mental states applicable to a crime of child abuse relate not to a particular result but rather to the nature of the offender's conduct in relation to the child or to the circumstances under which the act or omission occurred. *People v. Noble*, 635 P.2d 203, 210 (Colo.1981). Thus, as applicable here, a person acts "recklessly" when he consciously disregards a substantial and unjustifiable risk that, in light of the child's circumstances, a particular act or omission will place the child in a situation which poses a threat of injury to the child's life or health. *See* § 18–1–501(8), 8B C.R.S. (1986). So too, a person acts "with criminal negligence" when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that, in light of the child's circumstances, a particular act or omission will place the child in a situation which poses a threat of injury to the child's life or health. *See*

1. Prior to the first trial, the trial court had ruled *sua sponte* that the statutory language limiting the "treatment by spiritual means" defense to a duly accredited practitioner of a recognized church or religious denomination was violative of the Free Exercise and Establishment Clauses of the United States and Colorado Constitutions. Based on that ruling, the defendant, prior to the second trial, requested the court to sever the unconstitutional language from the statute and permit him to rely on the severed version of the statutory defense. The trial court postponed any ruling on the defendant's motion until the conclusion of the evidence. As we noted in the text, the trial court instructed the jury on a modified version of the affirmative defense and, so far as we can determine, never addressed the

defendant's request to sever the arguably unconstitutional parts of the statutory defense. Although the defendant raised various constitutional challenges to the limiting language of the "affirmative defense" in his appeal to the court of appeals, the court of appeals did not reach the defendant's constitutional challenges because, as stated by the court:

[T]here was evidence from which the jury could find that a reason other than spiritual treatment existed to consider the defendant's child endangered. Thus, the affirmative defense is inapplicable, and the constitutionality of § 19–3–103 [formerly § 19–1–114, *see* note 3 *infra* ] is irrelevant.

*Lybarger*, 790 P.2d at 862.

§ 18-1-501(3), 8B C.R.S. (1986).[2]

Section 18-6-401(6), 8B C.R.S. (1986), establishes the affirmative defense of "treatment by spiritual means" to the crime of child abuse and states:

> No child who in good faith is under treatment described in section 19-1-114, C.R.S., shall, for that reason alone, be considered to be abused or endangered as to his health within the purview of this section. This subsection (6) shall be an affirmative defense.

Section 19-1-114, 8B C.R.S. (1986), which is part of the Colorado Children's Code, states as follows:

> Notwithstanding any other provision of this title, no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone, be considered to have been neglected within the purview of this title.[3]

In *People in Interest of D.L.E.*, 645 P.2d 271 (Colo.1982) (*D.L.E. II*), we considered the constitutionality and scope of the "treatment by spiritual means" defense in the context of a dependency and neglect proceeding arising out of the refusal of a

---

**2.** Section 18-6-401(7)(a), 8B C.R.S. (1986), also punishes as a class 2 felony child abuse resulting in the death of a child when the offender acts knowingly. A person acts "knowingly" with respect to the conduct or circumstance involved in child abuse when he is aware that his conduct is of such nature or that such circumstance exists. § 18-1-501(6), 8B C.R.S. (1986); *see People v. Noble*, 635 P.2d 203, 210 (Colo.1981).

**3.** In 1987 the General Assembly repealed and reenacted with amendments the Colorado Children's Code. Ch. 138, sec. 1 to 49, § 19-1-101 et seq., 1987 Colo. Sess. Laws 695 to 823. The reenactment placed the "treatment by spiritual means" statute at section 19-3-103 of the Children's Code. This section was amended in 1989, ch. 172, sec. 1, § 19-3-103(1), 1989 Colo. Sess. Laws 924, and the present version is presently codified at section 19-3-103, 8B C.R.S. (1990 Supp.). The present version of the "treatment by spiritual means" statute is as follows:

> No child who in lieu of medical treatment is under treatment solely by spiritual means through prayer in accordance with a recognized method of religious healing shall, for that reason alone, be considered to have been neglected or dependent within the purview of this article. However, the religious rights of a parent, guardian, or legal custodian shall not limit the access of a child to medical care in a life-threatening situation or when the condition will result in serious handicap or disability. In such cases, the court may, as provided under section 19-1-104(3), order that medical treatment be provided for the child. A child whose parent, guardian, or legal custodian inhibits or interferes with the provision of medical treatment in accordance with a court order shall be considered to have been neglected or dependent for purposes of this article and injured or endangered for purposes of section 18-6-401, C.R.S.

A new subsection (2) was added to the statute, which states:

> (2) A method of religious healing shall be presumed to be a recognized method of religious healing if:
>
> (a)(I) Fees and expenses incurred in connection with such treatment are permitted to be deducted from taxable income as medical expenses pursuant to regulations or rules promulgated by the United States internal revenue service; and
>
> (II) Fees and expenses incurred in connection with such treatment are generally recognized as reimbursable health care expenses under medical policies of insurance issued by insurers licensed by this state; or
>
> (b) Such treatment provides a rate of success in maintaining health and treating disease or injury that is equivalent to that of medical treatment.

In 1989 the General Assembly repealed and reenacted with amendments section 18-6-401(6), ch. 172, sec. 2, § 18-6-401(6), 1989 Colo. Sess. Laws 924, 925. The present version of section 18-6-401(6), 8B C.R.S. (1990 Supp.), states:

> A parent, guardian, or legal custodian who chooses and legitimately practices treatment by spiritual means through prayer in accordance with section 19-3-103, C.R.S., shall not be considered to have injured or endangered the child and to be criminally liable under the laws of this state solely because he fails to provide medical treatment for the child, unless such person inhibits or interferes with the provisions of medical treatment for the child in accordance with a court order, or unless there is an additional reason, other than health care, to consider the said child to be injured or endangered.

We resolve the instant case, of course, on the basis of the statutory provisions in effect on the date of the offense charged and express no opinion on the presently existing statutory provisions relating to the affirmative defense.

parent to require her teenage son, D.L.E., to take medication in order to control grand mal epileptic seizures which, because of their frequency, posed a life-threatening risk to the child. The case had been before the court two years previously in *People in the Interest of D.L.E.*, 614 P.2d 873 (1980) (*D.L.E. I*). We concluded in *D.L.E. I* that, with respect to a prior petition in dependency and neglect based on the parent's refusal to provide medical care for the child, there was no support in the record to show that the child was in imminent danger as a result of the lack of medical care and, hence, both the parent and the child had the right to refuse medical treatment on religious grounds pursuant to section 19–1–114, 614 P.2d at 874–75. When the case was before us the second time, however, it was undisputed that D.L.E.'s refusal to take the prescribed medication seriously endangered his life and that D.L.E. and his mother were aware of this risk but chose to rely solely on prayer for treatment. The district court in *D.L.E. II* found that D.L.E.'s condition was life-threatening but, based on this court's decision in *D.L.E. I*, dismissed that part of the petition alleging that D.L.E. was dependent and neglected. In reversing the judgment, we drew on three decisions of the United States Supreme Court, *i.e.*, *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), for the proposition that, while the state bears a heavy burden to justify any infringement on a person's right to freely practice religious beliefs, "the family itself is not beyond regulation in the public interest as against a claim of religious liberty" and, therefore, "[t]he right to practice religion freely does not include the right or liberty to expose ... the child to ill health or death." *D.L.E. II,* 645 P.2d at 275–76. In concluding that the "treatment by spiritual means" defense is not absolute, we stated:

> We believe that [section 19–1–114] does not provide an absolute defense to a finding of dependency and neglect when the child's life is in imminent danger as a result of a failure to comply with a program of medical treatment on religious grounds.... In our view, the meaning of the statutory language, "for that reason alone," is quite clear. It allows a finding of dependency and neglect for other "reasons," such as where the child's life is in imminent danger, despite any treatment by spiritual means. In other words, a child who is treated solely by spiritual means is not, for that reason alone, dependent or neglected, but if there is an additional reason, such as where the child is deprived of medical care necessary to prevent a life-endangering condition, the child may be adjudicated dependent and neglected under the statutory scheme.

Because it was undisputed in *D.L.E. II* that the parent and the child were aware of the life-endangering risk posed by the failure to take medication, we had no reason to discuss the meaning of the term "good faith" in section 19–1–114. That term, however, is a critical part of the affirmative defense which section 18–6–401(6) makes expressly applicable to a prosecution for child abuse resulting in death, and it is necessary for us to determine the meaning of "good faith" in order to resolve this case.

"Good faith" has been defined in terms of both a subjective standard—*i.e.*, "an intangible and abstract quality" that encompasses "an honest belief"—and an objective standard—*i.e.*, "freedom from knowledge of circumstances which ought to put the holder upon inquiry." *Black's Law Dictionary* 623 (1979); *see also Webster's Third New International Dictionary* 978 (1986) (defining "good faith" as "a state of mind indicating honesty and lawfulness of purpose: belief in one's legal title or right: belief that one's conduct is not unconscionable or that known circumstances do not require further investigation: absence of fraud, deceit, collusion, or gross negligence"). We believe that the meaning to be attributed to the term "good faith" in section 18–6–401(6) should be in accordance with the purpose of the statutory scheme in which the term appears. *See Coppedge*

*v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 920–21, 8 L.Ed.2d 21 (1962).

The criminal proscriptions against child abuse are to protect children, who frequently are unable to care for themselves, from the risk of injury or death associated with conduct that places a child in a situation that poses a threat to the child's well-being. *People v. Taggart,* 621 P.2d 1375, 1382–83 (Colo.1981). The "treatment by spiritual means" defense, which is part of the statutory scheme, is intended to accommodate the religious beliefs of those parents who rely on prayer in lieu of medical care in treating a sick child. As we held in *D.L.E. II,* however, the codification of this defense was not intended to immunize a parent from the responsibility of providing medical care for a child under circumstances where medical treatment is necessary to prevent a life-endangering condition. *D.L.E. II,* 645 P.2d at 275. Nor is there any suggestion in the statutory text of section 18–6–401 that the affirmative defense was intended to permit a parent to withhold medical care when to do so would pose a risk of serious bodily harm to the child. The statutory scheme, as we interpret it, was intended to prohibit various forms of child abuse and at the same time to allow treatment by spiritual means to serve as an affirmative defense so long as the child is not in a life-endangering condition or in a situation that poses a substantial risk of serious bodily harm to the child. By a substantial risk of serious bodily harm we mean those conditions which if medically untreated may result in a significant impairment of vital physical or mental functions, protracted disability, permanent disfigurement, or similar defects or infirmities.

In accordance with the intended purpose of the statutory proscriptions against child abuse, we construe the term "good faith" in section 18–6–401(6) to mean not only a subjectively honest belief but also an objectively reasonable belief that the child is not suffering from a condition which if medically untreated will endanger the child's life or will pose a substantial risk of serious bodily harm to the child. A belief is objectively reasonable when it is based on a reasonable assessment of the facts and circumstances which were known or which were reasonably discernible to the parent.[4] To construe the "treatment by spiritual means" defense in a purely subjective manner would deprive the statutory proscriptions against child abuse of sensible meaning by relieving a parent of any obligation to provide medical care to a child in a life-endangering condition or in a condition that poses a substantial risk of serious bodily harm. A subjective good faith belief by a parent that a child in either of these conditions will be healed by spiritual means alone, therefore, will not support the "treatment by spiritual means" defense so as to relieve a parent of the obligation to provide medical care for the child. Nothing in the statutory text suggests that the legislature intended such a broad construction of the affirmative defense.

The affirmative defense of "treatment by spiritual means" is limited to those circumstances where the parent has an honest and reasonable belief that the child, although ill or injured, is not suffering from a condition which if medically untreated will constitute either a danger to the child's life or a substantial risk of serious bodily harm to the child. If, of course, the parent believes that the failure to provide

---

**4.** The standard of objective reasonableness is no stranger to the criminal law. *See e.g., United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (standard of objective reasonableness applicable in determining whether "good faith" exception to exclusionary rule has been satisfied); *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962) (employing objective standard of reasonableness in construing "good faith" for purpose of *in forma pauperis* criminal appeal); *Hare v. People,* 800 P.2d 1317 (Colo.1990) (affirmative defense of

self defense requires "reasonable belief" in imminent use of physical force by other person); *People v. Prante,* 177 Colo. 243, 493 P.2d 1083 (1972) (statutory requirement for assault on peace officer that defendant knew or "reasonably should have known" person assaulted was a peace officer not unconstitutionally vague; "the fact that a penal statute is framed in a way such as to require a jury to determine a question of reasonableness does not make it too vague to afford a practical guide to acceptable behavior").

medical treatment will endanger the child's life or will create a substantial risk of serious bodily harm to the child, then the parent is criminally liable for child abuse for failing to obtain necessary medical treatment for the child. The "treatment by spiritual means" defense is similarly inapplicable under circumstances where a parent believes that the child is not in danger of death or serious bodily harm but the parent's belief is not based on a reasonable assessment of the facts and circumstances which were known or should have been known to the parent.

### B.

■ The legislative classification of "treatment by spiritual means" as an affirmative defense has important consequences for a criminal prosecution for child abuse resulting in death. Section 18-1-407(1), 8B C.R.S. (1986), states that, unless the prosecution's evidence raises the issue involving an affirmative defense, "the defendant, to raise the issue, shall present some credible evidence on that issue." Once the issue involved in an affirmative defense is raised, the prosecution bears the burden of establishing the defendant's guilt beyond a reasonable doubt "as to that issue as well as all other elements of the offense." § 18-1-407(2), 8B C.R.S. (1986); see e.g., People v. Ledman, 622 P.2d 534, 538 (Colo.1981); Taggart, 621 P.2d at 1382.

■ The question whether there is credible evidence to support an affirmative defense is a question for the court to resolve. See, e.g., People v. Fuller, 781 P.2d 647, 651 (Colo.1989); People v. Dillon, 655 P.2d 841, 845 (Colo.1983); People v. Traubert, 625 P.2d 991, 993 (Colo.1981). If there is any credible evidence supporting the defense, the trial court is obliged to instruct the jury on the defense even if the supporting evidence consists of "highly improbable testimony by the defendant." Fuller, 781 P.2d at 651. While the ques-

tion of the availability of the defense is for the court and not the jury, it is the jury's function, and not the court's, to assess the credibility of the witnesses and the weight of the evidence with a view to determining whether the guilt of the defendant has been established beyond a reasonable doubt as to the issue involving the affirmative defense as well as all other elements of the crime charged.

■ "Treatment by spiritual means" will constitute an affirmative defense to the charge of child abuse resulting in death when there is some credible evidence on the following components: that the parent had an honest and reasonable belief that the child, although ill or injured, was not suffering from a condition which if medically untreated would endanger the child's life or would pose a substantial risk of serious bodily harm to the child; the parent was a duly accredited practitioner of a recognized church or religious denomination; and the parent elected to treat the child solely by spiritual means through prayer in accordance with the tenets and practices of the parent's church or religious denomination.[5] When there is some credible evidence on each of these components, the trial court must instruct the jury that the evidence has placed the affirmative defense in issue and that the prosecution bears the burden of establishing the defendant's guilt beyond a reasonable doubt on that issue.

### III.

The defendant argues that the court of appeals erred in its interpretation of the treatment by spiritual means defense and in its determination that the trial court's instructions on that defense did not rise to the level of reversible error. We agree with the defendant's argument.

### A.

■ We point out initially that the court of appeals erred in concluding that the

---

**5.** The statutory affirmative defense does not necessarily require the parent who otherwise qualifies under the statute to administer the "treatment by spiritual means." Thus, a parent who is a duly accredited practitioner of a recog-

nized church that endorses treatment by spiritual means as its tenet or practice may utilize the services of a minister or other church member for the spiritual treatment.

"treatment by spiritual means" defense was not applicable to this case because, in the court's view, "there was evidence from which the jury could find that a reason other than spiritual treatment existed to consider the defendant's child endangered." *Lybarger*, 790 P.2d at 862. As we have previously discussed, a parent may rely on treatment by spiritual means as long as the parent has an honest and reasonable belief that the child is not suffering from a condition which if medically untreated will endanger the child's life or will pose a substantial risk of serious bodily harm to the child. *See* Part IIA, *supra*. Under the court of appeals' construction of the affirmative defense, a parent would be precluded from relying on the spiritual treatment whenever there was any reason, other than spiritual treatment, that posed some threat to the child's health, even though the child was not in danger of death or serious bodily harm. Such a construction virtually eliminates the affirmative defense in any prosecution for child abuse, which by definition requires at the minimum that there be an unreasonable placement of the child in a situation which poses a threat of injury to the child's life or health. § 18–6–401(1), 8B C.R.S. (1986).

"The General Assembly is vested with constitutional authority not only to define criminal conduct and to establish the legal components of criminal liability but, as well, to delineate statutory defenses and bars to criminal prosecution." *People v. Guenther*, 740 P.2d 971, 977 (Colo.1987); *see People v. Low*, 732 P.2d 622, 627 (Colo. 1987); *Hendershott v. People*, 653 P.2d 385, 390–91 (Colo.1982), *cert. denied*, 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983); *People v. Ledman*, 622 P.2d 534, 539 (Colo.1981). The limiting construction adopted by the court of appeals is irreconcilable with the clear legislative decision, manifested by the statutory language of section 18–6–401(6), to make the affirmative defense of "treatment by spiritual means" available under limited circumstances in a prosecution for child abuse even when the alleged abuse results in death. We therefore reject the construc-

tion of the "treatment by spiritual means" defense adopted by the court of appeals.

### B.

The next question is whether there was "some credible evidence" to support an instruction on the affirmative defense of "treatment by spiritual means." It should be emphasized here that our function is not to determine the credibility of various witnesses or the weight to be given their testimony, but rather simply to decide whether there is evidence in the record to satisfy the rather low statutory standard for submitting an affirmative defense to a jury. *See, e.g., Fuller*, 781 P.2d at 651. We are satisfied that the evidentiary predicate for the "treatment by spiritual means" defense was established.

To be sure, the prosecution presented evidence which established that the defendant's five-week-old daughter was in a life-endangering condition. There was also "some evidence," however, that the defendant believed in good faith—that is, he had an honest and reasonable belief based on the facts and circumstances which were known or were reasonably discernible to him—that his daughter was not suffering from a condition which if medically untreated would endanger the child's life or would pose a substantial risk of serious bodily harm to the child. Evidence admitted during the trial showed that some of the defendant's other children had symptoms similar to those experienced by his five-week-old daughter and that these children had recovered in due course. The record further shows that on March 13, 1982, two days before the child's death, two officers of the Larimer County Sheriff's Department examined the child and did not believe that the child's condition was such as to warrant the intervention of the Department of Social Services. Although the evidence showed that the child's condition worsened on the following day, the child appeared to be significantly improved on the morning of March 15, shortly before her death. At that time, both the defendant and Mr. McGillicuddy believed that the child was on the road to recovery. The

defendant's wife similarly noticed that on the morning of March 15 the child was more active, was breathing adequately, and was able to take fluids. While the evidence of the defendant's "good faith" belief might be described as sparse, it nonetheless was sufficient to satisfy the threshold requirement of "some credible evidence" on that component of the affirmative defense.

There was also some credible evidence on the other components of the affirmative defense. For example, there was evidence that the defendant was a member and minister, and hence a duly accredited practitioner, in the Word of Faith Evangelistic Association and that the association was a recognized church or religious denomination. The determination of whether a particular association of persons constitutes a "recognized church or religious denomination" is necessarily fact-specific in nature. What is significant, in our view, is that there was evidence showing that the members of the Word of Faith Evangelistic Association held theological beliefs, based on both the Old and New Testament of the Bible, which were of great significance in their lives and that the Association members engaged in prayer and other forms of worship as an expression of their religious beliefs. There was also evidence that the defendant relied solely on prayer to God as the method of healing his children. Finally, there was also evidence that prayer healing as a form of "treatment by spiritual means" was an accepted practice for some members of the Word of Faith Evangelistic Association. Because there was "some credible evidence" on the basic components of the "treatment by spiritual means" defense, the trial court was obliged to properly instruct the jury on that defense.

### C.

■ We turn then to consider whether the trial court correctly instructed the jury on the "treatment by spiritual means" defense. We point out that, in contrast to the court of appeals' opinion, the defendant made timely objection to the trial court's modified version of the affirmative defense. Defense counsel argued to the trial court that the second paragraphs of Instructions 9 and 11 had the effect of relieving the prosecution of its burden of proof with respect to the "treatment by spiritual means" defense. Notwithstanding these objections, the court of appeals analyzed the propriety of the instructions on the basis of the plain-error standard of review. In light of the defendant's contemporaneous objection to the instructions, the appropriate standard for review in this case is whether the trial court erred in giving these instructions and, if so, whether the error affected the substantial rights of the defendant or instead might be deemed harmless. See CAR 35(e); Crim.P. 52. An error is harmless only when a reviewing court can say with fair assurance that, in light of the entire record, the error did not substantially influence the verdict or impair the fairness of the trial. *King v. People*, 785 P.2d 596, 604–05 (Colo.1990); *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo.1989).

■ The second paragraph of Instruction 9, to which the defendant objected, stated that if a jury found "that the affirmative defense is not available to the Defendant, you should find the Defendant guilty of Child Abuse Resulting in Death." The effect of this instruction was to vest the jury with the prerogative to determine whether the "treatment by spiritual means" defense was to be an issue in this case. Section 18–1–407(1), 8B C.R.S. (1986), does not vest the jury with this prerogative, but rather makes an affirmative defense available whenever there is "some credible evidence" to support the affirmative defense. Once there is some credible evidence in support of the affirmative defense, the defense clearly is an issue in the case, and the jury's function is to determine whether the prosecution has established the defendant's guilt beyond a reasonable doubt as to the affirmative defense as well as the other elements of a crime charged. § 18–1–407(2), 8B C.R.S. (1986).

The second paragraph of Instruction 11, to which the defendant also objected, erro-

neously stated that the affirmative defense of "treatment by spiritual means" was

> not available to the Defendant if the People proved beyond a reasonable doubt that under the circumstances the Defendant ... consciously disregarded a substantial and unjustifiable risk of death to [his daughter] if she did not receive available medical care or grossly deviated from a standard of reasonable care in failing to perceive the child's condition and the need for immediate medical attention available to the child.

The effect of this instruction was to virtually preempt the affirmative defense by telling the jury that as long as the prosecution proved beyond a reasonable doubt that the defendant acted in such a manner so as to satisfy all the elements of the crime charged, then the affirmative defense was simply not an issue for the jury's consideration.

The second paragraphs of Instructions 9 and 11, therefore, contained erroneous statements of law which improperly relegated to the jury the function of determining the availability or nonavailability of the affirmative defense and eliminated the prosecution's burden of proof with respect to the affirmative defense. Both instructions were at odds with the standard Colorado jury instruction on an affirmative defense, which states:

> The evidence presented in this case has raised an affirmative defense.

> The prosecution has the burden of proving the guilt of the defendant to your satisfaction beyond a reasonable doubt as to the affirmative defense, as well as to all the elements of the crime charged.

> After considering the evidence concerning the affirmative defense, with all the other evidence in this case, if you are not convinced beyond a reasonable doubt of the defendant's guilt, you must return a verdict of not guilty.

CJI–Crim. 7:01.

We acknowledge that the latter part of Instruction 12 told the jury that if, "[a]fter considering the evidence concerning the affirmative defense, along with all the other evidence in the case, ... you are not convinced beyond a reasonable doubt of the Defendant's guilt, you must return a verdict of not guilty." [6] One might read this part of Instruction 12 as the substantial equivalent of the basic principle that the prosecution bears the burden of proving beyond a reasonable doubt the guilt of the defendant as to the affirmative defense. Even if so read, however, we are satisfied that the cumulative effect of Instructions 9, 11, and 12 was to give the jury a mixed message. On the one hand, the jury was told in Instructions 9 and 11 that it was their function to determine the availability of the affirmative defense and that they should disregard the affirmative defense if the prosecution proved beyond a reasonable doubt the defendant's guilt as to the essential elements of the crime of child abuse resulting in death. On the other hand, the jury could well have understood the latter part of Instruction 12 as imposing on the prosecution the burden of proving beyond a reasonable doubt the guilt of the defendant as to the issue involved in the affirmative defense of "treatment by spiritual means."

The propriety of a particular jury instruction should be viewed in the context of the total instructions. We have held on prior occasions that where two instructions are in direct conflict on an essential issue in the case, and one of the instructions contains an incorrect and clearly prejudicial statement of law, the fact that some other

---

**6.** We note that the first part of Instruction 12 informed the jury that if you find that "the evidence presented in this case has raised the issue of the ['treatment by spiritual means' defense]," then the prosecution "has the burden of proving beyond a reasonable doubt that the affirmative defense is not applicable to the Defendant or his conduct." Instruction 12 echoes a similar message to that conveyed by the second paragraphs of Instructions 9 and 11—namely, that it is the jury's function to determine whether the affirmative defense should be an issue in this case at all—and in that respect suffers from a similar infirmity. The trial court could have avoided much of the confusion and error in its instructions if, instead of formulating a modified version of the legal principles relating to an affirmative defense, it simply followed CJI–Crim. 7:01, which finds its source in section 18–1–407, 8B C.R.S. (1986).

instruction might contain a correct statement of law does not dispel the potential for harm created by the erroneous instruction. *E.g., Barnes v. People*, 735 P.2d 869, 874 (Colo.1987); *People v. Riley*, 708 P.2d 1359, 1365–66 (Colo.1985). The cumulative effect of Instructions 9, 11, and 12 was to convey to the jury a confusing and erroneous statement of law with respect to the jury's function in determining the availability of the "treatment by spiritual means" defense and also with respect to the prosecution's burden of proof as to the affirmative defense.

### D.

Our final consideration is whether the trial court's erroneous instructions should be disregarded as harmless. Because the trial court's instructions presented the jury with an erroneous statement concerning the jury's prerogative to determine the availability of the "treatment by spiritual means" defense and also presented the jury with conflicting statements regarding the prosecution's burden of proof on the affirmative defense, we cannot say with any fair assurance that the error did not substantially influence the verdict or impair the fairness of the trial. The erroneous instructions on the "treatment by spiritual means" defense, therefore, cannot be deemed harmless.

The judgment of the court of appeals is accordingly reversed and the case is remanded to that court with directions to return the case to the district court for a new trial not inconsistent with the views herein expressed.

ROVIRA, C.J., does not participate.