CHIEF JUSTICE COATS delivered the Opinion of the Court.
¶1 *413 Ray petitioned for review of the court of appeals' judgment affirming his convictions for attempted first degree murder, first degree assault, and accessory to first degree murder. As pertinent to the issues before the supreme court, the intermediate appellate court rejected Ray's claim that one of the self-defense-related instructions given by the district court implicitly shifted the burden of proof to him by improperly imposing conditions on the availability of that affirmative defense; and in the absence of any record indication that the jury later watched a recorded witness interview admitted as an exhibit at trial, the appellate court declined to address his claim that the district court abused its discretion in allowing the jury unrestricted access to that recording.
¶2 Because the language of the instruction in question did not permit the jury to reconsider the court's determination, based on the evidence at trial, that the affirmative defense of person was available to Ray, and because the jury was properly instructed concerning the People's burden to disprove that, and any, affirmative defense, the district court did not err in instructing the jury as to his assertion that he acted in defense of himself and a third person. Although error resulted from the district court's reliance on later-overruled case law permitting the jury to have unrestricted access to the exhibit in question, when the content of that exhibit is compared with the other evidence admitted at trial, the error was harmless. The judgment of the court of appeals is therefore affirmed.
I.
¶3 Robert Ray was charged with first degree murder and accessory to murder in connection with the shooting death of Gregory Vann, as well as attempted murder for trying to shoot Jeremy Green, and both first degree attempted murder and first degree assault for each of the separate shootings of Elvin Bell and Javad Marshall-Fields. He was acquitted of the murder of Vann and the attempted murder of Green but was convicted of being an accessory to the murder of Vann and of committing both attempted first degree murder and first degree assault for the shootings of Bell and Marshall-Fields. Ray was sentenced concurrently for his dual convictions of attempted murder and assault with regard to Bell and his dual convictions of attempted murder and assault with regard to Marshall-Fields, but consecutively for the crimes he committed against Bell, the crimes he committed against Marshall-Fields, and the crime he committed relative to the murder of Vann, resulting in a total sentence to the custody of the department of corrections for 108 years.[1]
¶4 The charges all arose from events occurring at a melee at Lowry Park on July 4, 2004, and its aftermath. The evidence at trial included numerous first-hand witness accounts, a home video taken by one of the attendees, a recording of a police interview of Green made shortly after the events in question, and photographic, real, and testimonial evidence concerning the wounds of Bell and Marshall-Fields and the weapons used by Ray and Sir Mario Owens, Ray's very close friend. The defendant also testified on his own behalf.
*414 ¶5 Although there was much conflicting testimony, it was undisputed that the Lowry Park event, attended by as many as 200 people, was organized by Vann and Marshall-Fields as a musical event and barbeque, which was free and open to the public. Early in the evening, the defendant was confronted by Marshall-Fields about his behavior at the event, as a result of which interaction the defendant's wife, who was also in attendance with his sister, called Owens to come and support the defendant. Sometime later, about 9:00 p.m., as the wife and sister were attempting to drive away, they became embroiled in a confrontation with a crowd of people, which was joined by the defendant and Owens. A home video showed both men and women involved in the struggle. There was testimony that Vann was attempting to break up the fight, and Green expressly stated in the interview that he confronted the defendant about his aggressive behavior, head-butted him in the face, and heard him, at several points during the confrontation, threaten to kill everybody.
¶6 Shortly thereafter, the defendant admittedly lifted his shirt as he walked forward toward the crowd, revealing a handgun in his waistband, and the defendant's wife identified another man seen in the home video, similarly raising his shirt, as Owens. In the confrontation that ensued, Owens shot Vann in the chest at close range and once more after he fell. As Owens attempted to escape to the car being driven by the defendant, he was pursued by Bell and Marshall-Fields, both of whom were then shot several times. Although both men indicated that they initially thought they had been shot by Owens, being the only person they had seen with a gun, another witness testified that he saw the defendant calmly come around the car, put his gun under his left arm, and shoot both men repeatedly.
¶7 One nine-millimeter and two .380 caliber shell casings were found at the scene, and two .380 caliber bullets were recovered from the body of Vann, who was clearly shot by Owens. One bullet fragment that was later removed from the chest wall of Bell, whom the defendant admitted he shot, was identified as having splintered from a nine-millimeter bullet. Both of Marshall-Fields's wounds had clear entrance and exit wounds, leaving no identifiable bullets or bullet fragments. The defendant's wife testified that the defendant's stepfather disposed of both guns. No witness testified to seeing anyone other than Owens or the defendant with a weapon.
¶8 Although the defendant admitted that in the days following the shooting, he took active steps to help Owens evade capture, he also testified that he did not shoot Marshall-Fields and that although he did shoot Bell, he did so only in defense of himself and Owens. The defendant confirmed that he had a nine-millimeter semiautomatic handgun in his waistband, but he testified that he showed it only in an attempt to force the crowd back so that he could search for a chain he lost during the struggle. He also testified that he never saw Owens with a gun that night, but that he did see blood on Owens's shirt when he was being beaten by Bell and therefore believed Bell had shot Owens, causing the defendant to defensively shoot Bell. Finally, with regard to Green's statement that the defendant repeatedly threatened to kill everybody, the defendant testified simply that he did not recall doing so.
¶9 Following affirmance of his convictions by the court of appeals, the defendant petitioned this court for further review on a host of issues. We issued our writ of certiorari only with regard to the questions whether the district court's instructions erroneously shifted the burden of proof relative to the defendant's assertion of self-defense and whether the jury's having had unfettered access to the Green videotaped interview violated the defendant's federal and state constitutional rights to due process and a fair trial.
II.
¶10 The jury was instructed on the defendant's asserted affirmative defense of acting in defense of himself or a third person in four separate instructions. In addition to an instruction generally notifying the jury of and explaining the prosecution's burden of proof with regard to the elements of each offense, which included committing the other *415 elements without the affirmative defense, the district court instructed the jury, in a separate instruction, that the evidence had raised an affirmative defense; that the prosecution had the burden to prove the defendant's guilt beyond a reasonable doubt as to that affirmative defense as well as the other elements of the crime charged; and that if after considering the evidence of the affirmative defense with the other evidence in the case the jury was not convinced beyond a reasonable doubt as to the defendant's guilt, it would be required to return a not guilty verdict. In a third instruction, the jury was then instructed as to the circumstances under which the defendant's use of physical force and deadly physical force would be justified in defense of himself or another person, including the requirement that the defendant must have had a reasonable belief that he or another person was in imminent danger of being killed or of receiving great bodily injury.
¶11 In the instruction challenged by the defendant here, numbered 25, the jury was further instructed concerning the question whether an actual belief by the defendant, if the jury were to find him to have had one, could be considered to have been supported by reasonable grounds.[2] Specifically, the defendant contends that by instructing the jury in the language, "[i]n deciding whether or not the defendant had reasonable grounds for believing," and further that the jury "should determine whether or not he acted as a reasonable and prudent person," the court implicitly imposed conditions on even the "availability" of the defense, effectively shifting the burden to him to first prove these conditions before being entitled to have the prosecution disprove the defense beyond a reasonable doubt. Unlike our precedent upon which the defendant relies, Instruction No. 25 does not mention anything about the "availability" of the defense, much less suggest that the defendant bore a burden to prove preconditions to its availability; rather, on its face, the instruction purports to further explain the meaning of a statutory concept included in the defense itself.
¶12 It is now well-settled that the issue of justification for intentionally or knowingly killing another person in defense of oneself or a third person is an affirmative defense, as to which the trial court is obliged to instruct the jury whenever the court determines that the defendant has presented some credible evidence on the issue and the defendant requests that the court do so. § 18-1-407(1), C.R.S. (2018); § 18-1-704(1), (2)(a), C.R.S. (2018); § 18-1-710, C.R.S. (2018); Montoya v. People , 2017 CO 40, ¶¶ 26-29, 394 P.3d 676, 686-88 (explaining People v. Pickering , 276 P.3d 553, 555 (Colo. 2011) (stating that self-defense is an affirmative defense with respect to crimes requiring intent, knowledge, or willfulness)); People v. Speer , 255 P.3d 1115, 1119 (Colo. 2011). Once the defense has been adequately raised and presented by the court to the jury, the guilt of the defendant must be established by the prosecution beyond a reasonable doubt as to that affirmative defense, just as to the other elements of the offense against which the defendant is defending. § 18-1-407(2) ; Pickering , 276 P.3d at 555.
¶13 On several occasions in the past, we have drawn a clear distinction between the prosecution's burden to disprove an affirmative defense to the jury's satisfaction, beyond a reasonable doubt, once it has been placed at issue, and the question whether the defense has been placed at issue in the first place, finding in those cases that an instruction permitting the jury to redetermine the question of a defense's availability or applicability effectively permitted the jury to absolve the prosecution of its burden to disprove the defense and therefore its duty to *416 prove all of the elements of the offense. See People v. Janes , 982 P.2d 300, 303-04 (Colo. 1999) ; Lybarger v. People , 807 P.2d 570, 574, 579, 581-83 (Colo. 1991). In Lybarger , where the jury was instructed both that it should find the defendant guilty if the affirmative defense in question was not "available" to him and that the defense would not be "available" to him if the People proved specified conditions virtually identical with the elements of the crime with which he was charged, we found that taken together these instructions not only erroneously relegated to the jury the function of determining the availability or non-availability of the affirmative defense but also effectively eliminated the prosecution's burden of proof with respect to that defense. 807 P.2d at 574, 581-82. Again, in Janes , which involved the virtually unique situation of the so-called "make-my-day" defense, which can operate as either a pre-trial immunity, which must be proved by the defendant, or an affirmative defense at trial, to be disproved by the prosecution, we held that instructing the jury in the language of the immunity-that the affirmative defense would not be "available" unless the jury first found the victim to have made a knowing unlawful entry-similarly relieved the prosecution of any burden to disprove the defense, until after proof of a precondition only the defendant could have an interest in proving. 982 P.2d at 303-04.
¶14 Unlike the erroneous instructions in Lybarger and Janes , Instruction No. 25 neither stated, nor even implied, anything about the availability or applicability of the defense. Rather, it expressly referenced, and embellished on a concept contained in, the immediately preceding affirmative defense instruction, which itself expressly spelled out the prosecution's burden to disprove the defense beyond a reasonable doubt, by detailing the findings necessarily included in the conditions of the defense. To the extent the defendant suggests that the instruction's use of the phrase "whether or not" relieved the prosecution of its burden by implying an obligation of the jury to determine whether any belief actually held by the defendant was or was not reasonable prior to holding the prosecution to its burden to disprove that the defendant's conduct was justified, there was little chance the jury could have been misled by such a subtle and nuanced interpretation, especially in light of its other express instructions concerning the prosecution's burden. The jury was expressly instructed of the prosecution's burden to disprove the affirmative defense multiple times, in substantially the language of the statutes and pattern instructions, including in the very affirmative defense instruction whose terms were the subject of explanation in Instruction No. 25.
III.
¶15 Despite being refreshed with the transcript of the recording of his interview with the police, Green repeatedly asserted a lack of memory and therefore failed to answer a majority of the prosecutor's questions concerning the Lowry Park shootings. As a result, the videotaped interview was admitted into evidence as a prior inconsistent statement. Over the defendant's objection, the district court ruled that recent changes to the civil procedural rules had eliminated any limitation on exhibits being taken into the jury room during deliberations, and it ordered that the video and equipment to view it be made available to the jury. Although the cases of Frasco v. People , 165 P.3d 701 (Colo. 2007), and DeBella v. People , 233 P.3d 664 (Colo. 2010), had not yet been announced by this court, and the district court could therefore not have been aware of them, our rulings in those cases expressly overruled the precedents relied on by the district court and made clear that its ruling permitting unfettered access to Green's out-of-court interview, without any exercise of discretion on its part, was error.[3]
¶16 However, even a properly objected-to trial error will be disregarded as harmless if that error did not substantially *417 influence the verdict or affect the fairness of the trial proceedings. James v. People , 2018 CO 72, ¶ 19, 426 P.3d 336, 341 ; see also Crim. P. 52(a). While the strength of the evidence supporting a verdict is often an important consideration in assessing harmlessness, so too is the specific nature of the error in question and the nature of the prejudice or risk of prejudice associated with that error. People v. Roman , 2017 CO 70, ¶ 14, 398 P.3d 134, 138 ; Crider v. People , 186 P.3d 39, 43 (Colo. 2008). As we made clear in Frasco , the reason trial courts have an obligation, at least where prompted to do so by a party, to exercise discretion in permitting testimonial exhibits to be viewed by deliberating juries is to guard against their being given undue weight or emphasis, much as they have an obligation with regard to jury requests to review transcripts of specific trial testimony. 165 P.3d at 703-05 (analogizing testimonial exhibits to the trial transcripts at issue in Settle v. People , 180 Colo. 262, 504 P.2d 680 (1972) ); see also Martinez v. People , 2017 CO 36, ¶ 31, 393 P.3d 557, 563 ("[J]urors' unlimited access in the jury room to only one side of the story heightened the risk that they would give that side undue weight ...."). While we have never circumscribed the trial court's discretion in this regard by mandating time limitations on jury access or requiring particular limiting instructions, see Frasco , 165 P.3d at 704, we have consistently emphasized that the trial court must exercise its discretion in allowing such exhibits into the jury room, with the ultimate objective of assessing whether using the exhibit in question will aid the jury in its proper consideration of the case, and even if so, whether a party will nevertheless be unfairly prejudiced by the jury's use of it, id. at 704-05 ; see also DeBella , 233 P.3d at 668.
¶17 Because testimonial exhibits will, by definition, always have been admitted into evidence, unless they were erroneously admitted in the first place, allowing them into the jury room during deliberations will never risk exposure of the jury to evidence not properly before it. Nevertheless, the discretionary decision whether to permit the jury to view testimonial exhibits again, and perhaps repeatedly, is not dissimilar from a trial court's discretionary determination with respect to the admissibility of cumulative testimony in the first instance: whether the incremental probative value of that cumulative testimony is substantially outweighed by the unfairly prejudicial impact of its repetition. See People v. Saiz , 32 P.3d 441, 446, 448 (Colo. 2001) (explaining that CRE 403 requires trial courts to balance the incremental probative value of evidence relative to other evidence in the case against the rule's policy reasons for exclusion of, among other things, cumulative evidence). In each case, the question for the court is whether the added jury exposure, in light of all the other evidence before it, will be more helpful or more harmful to its deliberations, see Frasco , 165 P.3d at 704-05 ; Saiz , 32 P.3d at 446, and because this discretionary choice involves a balance of helpfulness and harmfulness in the first instance, the question whether that balance was made erroneously or amounted to an abuse of discretion will necessarily be closely related to the question whether any error in admission, if it occurred, was harmless. With regard to the question of admissibility in the first instance, we have long recognized that the decision is a highly discretionary one, subject to review on appeal only on the assumption of maximum probative value and minimum unfair prejudice. People v. Gibbens , 905 P.2d 604, 607 (Colo. 1995).
¶18 Accordingly, we have found the failure of trial courts to adequately control jury access to testimonial exhibits to be most problematic where the jury's ultimate determination would necessarily turn on its assessment of the credibility of witnesses, as distinguished from the force of real, or demonstrative, evidence. This has especially been the case where resolution of the issue in question must turn on the assessment of a witness account of the commission of the crime, by the only person other than the defendant to have purportedly witnessed the crime denied by him, which account is both contradictory of the principal defense and the only testimonial account the jury is permitted to repeatedly view. People v. Jefferson , 2017 CO 35, ¶ 59, 393 P.3d 493, 503-04 ; DeBella , 233 P.3d at 668-69. In DeBella , where the credibility of the child sexual-assault victim was severely challenged on *418 cross-examination and the child's lack of credibility was the principal theory of the defense, we therefore found reversible the decision to allow unlimited jury access to his hour-long, out-of-court interview, which-being the only complete recounting of the assaults-we characterized as the "linchpin" of the prosecution's case. 233 P.3d at 668-69. Similarly, in Jefferson , where the principal theory of the defense was that the child sexual assault allegations were not credible, and having introduced no physical evidence of the crime, the prosecution's case once again rested on the alleged victim's often inconsistent allegations, we found reversible the trial court's decision to allow unlimited jury access to a DVD of the child sexual-assault victim's out-of-court interview. ¶¶ 59-60, 393 P.3d at 503-04 ; cf . Martinez , ¶¶ 30-33, 393 P.3d at 562-63 (distinguishing DeBella and Jefferson largely on grounds that DVDs of the victim interviews in Martinez did not similarly serve as linchpin of prosecution's case, where defendant did not base his defense on inconsistencies between victims' in- and out-of-court accounts and where victims' in-court testimony was sufficiently detailed that exhibits were not needed to fill gaps in that testimony).
¶19 Unlike the testimonial exhibits at issue in DeBella and Jefferson , the videotape of Green's interview made shortly after the shootings in this case was not inconsistent with anything to which he testified at trial and did not directly contradict any testimony of the defendant concerning the pertinent events. The exhibit was admitted on the basis of Green's failure to recall, a ruling not before this court, rather than any contradiction of his testimony at trial. And when confronted with Green's statement in the exhibit to the effect that he threatened to kill everyone, the defendant did not dispute making those statements but testified merely that he did not recall doing so.
¶20 Perhaps even more importantly, however, unlike in DeBella and Jefferson , the defendant's guilt in this case did not turn on the credibility of conflicting testimony of the principals, unsupported by corroborating physical evidence or the testimony of other disinterested witnesses. With regard to Bell, there was never any dispute that the defendant intentionally shot him at close range with a nine-millimeter semiautomatic handgun. The defendant merely disputed the number of shots fired and asserted that he shot Bell in defense of himself and Owens, a matter as to which Green's out-of-court statement that the defendant earlier in the evening threatened to kill everyone could have had but peripheral relevance. With regard to that defense, the earlier, universal threat against everyone present at the event could at most suggest that the defendant had already formed an intent to kill Bell, without regard to any imminent threat from him. In stark contrast to this generalized threat, allegedly made in anger and in the midst of a confrontation against a number of people, however, the direct and primary evidence of the defendant's intent to kill came from the shooting itself and its surrounding circumstances, including the defendant's preparatory threatening gesture to the crowd, the fact of his shooting Bell multiple times at close range, the relatively weak evidence that he had reasonable grounds to believe he or Owens was being threatened with deadly force, and, most particularly, eye-witness testimony that he concealed his gun under his arm and calmly shot both Bell and Marshall-Fields during their struggle with Owens. See People v. Dist. Court , 779 P.2d 385, 388 (Colo. 1989) (stating that evidence of intent may include "the use of a deadly weapon, the manner in which it was used, and the existence of hostility ... between the accused and the victim" and noting that "[t]he fact finder may infer an intent to cause the natural and probable consequences of unlawful voluntary acts"); see also People v. Opana , 2017 CO 56, ¶ 17, 395 P.3d 757, 762 (stating that the intended, natural, and probable consequence of the defendant admittedly shooting the victim at close range was death). In consideration of this other and much more direct and powerful evidence that the defendant was not acting in self-defense, there is little likelihood that having the opportunity to see Green's pre-recorded statement more than once had a substantial impact on the jury's verdict as to Bell. See James , ¶ 19, 426 P.3d at 341.
¶21 With respect to the shooting of Marshall-Fields, in the absence of conclusive evidence *419 that his wounds were inflicted with the defendant's gun, the defendant denied any responsibility for that shooting. Nevertheless, the relevance of Green's statements could at most have been equally peripheral. The universal threat to kill everyone at the event offered little motive or support for the shooting of Marshall-Fields, especially in light of the much more direct and powerful evidence that the defendant actually did so. Both Bell and Marshall-Fields were embroiled in a struggle with the defendant's friend Owens, and both were shot virtually simultaneously, with an eye-witness testifying that he personally watched the defendant conceal his gun beneath his arm and calmly shoot both men, one of whom the defendant admitted intentionally shooting in defense of his friend.
¶22 Unlike those instances in which we have found reversible error in allowing unrestricted access to testimonial exhibits, the exhibit in this case was therefore not only not the "linchpin" of the prosecution's case; rather, with regard to the shootings of Bell and Marshall-Fields, the crimes of which the defendant was actually convicted, it was neither substantially helpful nor harmful. While it may arguably have been peripherally meaningful with regard to the charge of being complicit with Owens in the murder of Vann, the charge of which the defendant was acquitted, the district court did not suggest that it considered the exhibit meaningful even for that purpose. Indeed, in closing argument, the prosecution relied on Green's, "I'll kill you all," statements only as evidence of the defendant's complicity in the murder of Vann. The error in this case resulted simply from the district court's reliance on existing precedent to the effect that the exhibit was to go to the jury as a matter of course, regardless of its possible impact on the jury's deliberations.
¶23 Under these circumstances, we can say with confidence that there was not even a reasonable possibility that allowing the jury to view the exhibit during deliberations adversely affected the jury's verdict, much less that it affected a substantial right of the defendant. See Krutsinger v. People , 219 P.3d 1054, 1058 (Colo. 2009) (making clear that the "reasonable possibility" standard for constitutional error is a more onerous harmless-error standard than the "substantially influence" standard for non-constitutional error).
IV.
¶24 Because the language of the instruction in question did not permit the jury to reconsider the court's determination, based on the evidence at trial, that the affirmative defense of person was available to the defendant, and because the jury was properly instructed concerning the People's burden to disprove that, and any, affirmative defense, the district court did not err in instructing the jury as to the defendant's assertion that he acted in defense of himself and a third person. Although error resulted from the district court's reliance on later-overruled case law permitting the jury to have unrestricted access to the exhibit in question, when the content of that exhibit is compared with the other evidence admitted at trial, the error was harmless. The judgment of the court of appeals is therefore affirmed.
JUSTICE GABRIEL concurs in part and dissents in part, and JUSTICE HART joins in the concurrence in part and dissent in part.

In a later trial not at issue here, the defendant was convicted as a complicitor for, among other crimes, the subsequent murders of Marshall-Fields and his fiancée. The attempted first degree murder convictions in the present case were used as sentence aggravators in the defendant's death sentence that resulted from the later trial. Evidence relating to these murders was not introduced at trial in the present case.

In deciding whether or not the defendant had reasonable grounds for believing that he or another was in imminent danger of being killed or of receiving serious bodily injury, or that he or another was in imminent danger from the use of unlawful physical force, you should determine whether or not he acted as a reasonable and prudent person would have acted under like circumstances. In determining this, you should consider the totality of the circumstances, including the number of people reasonably appearing to be a threat.
It is not enough that the defendant believed himself or another to be in danger, unless the facts and circumstances shown by the evidence and known by him at the time, or by him then believed to be true, are such that you can say that as a reasonable person he had grounds for that belief.

To be clear, the error occurred when the court ruled, without considering the risk of undue prejudice, and consequently without exercising any discretion, that the jury must be allowed unfettered access to the exhibit. See DeBella v. People , 233 P.3d 664, 668 (Colo. 2010). Therefore, the question whether, or how many times, the jury watched the recorded interview could at most be relevant to the harmfulness of that erroneous ruling.